UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
CORAL REALTY, LLC, and CORAL CRYSTAL LLC,            Civil Action No.
                                                                                     1:17-cv-01007
                                    Plaintiffs,

                    v.

FEDERAL INSURANCE COMPANY,

                                    Defendant.
-----------------------------------------------------------------------X

# DECLARATION OF WAYNE W. MARTIN

WAYNE W. MARTIN deposes and states the following under the penalty of perjury:

1. I am a construction industry professional with over fifty years of experience, beginning in 1967.

2. I am President of Eastern Exterior Wall Systems Inc. and have served in that role or in the role of President of an operating division within EEWS since 2001.

3. I am responsible for the full operations of EEWS's business, which is that of a specialty contractor focused on the manufacture, fabrication, and installation of exterior wall systems of many different types for major commercial, institutional, and industrial buildings.

4. I served as appraiser for Federal Insurance Company ("Federal") in connection with the above-captioned matter.

5. Charlie Murray served as appraiser for Coral Realty, LLC, and Coral Crystal LLC (collectively "Coral").

6. The appraisal panel included myself, Coral's appraiser, and the umpire Michael Young (collectively, the "Panel").

1

7. Coral's building located at 201 East 14th Street/129 Third Avenue, New York, New York, is used as a New York University dormitory (the "Building").

8. I was informed that the Building was damaged in December 2012 during construction of a neighboring structure.

9. I observed a minor amount of concrete pressed against some areas of the Building's north wall (the "Wall").

10. The Wall is an exterior insulation and finish system (EIFS) wall on its exterior with standard drywall affixed to the interior plane of its cold formed metal studs.

11. I observed minor damage to the Wall in apartments 307A and 407A of the Building.

12. Despite the extremely minor amount of damage, the umpire and Coral's appraiser signed an appraisal award for $5,528,866.00 (the "Award" or the "Appraisal Award").

13. I submit this Declaration in support of Federal's Motion to Vacate or Modify the Appraisal Award, in Whole or in Part.

**Appraisal Process**

14. I asked the Panel to appraise the cost of repairing the damage from the exterior of the Building (the "Exterior Method").

15. The damage to the Wall or damage to any similar wall is routinely repaired by accessing the damage from the exterior (Federal's Exterior Method) to perform the repairs in the same manner as the wall was initially constructed.

16. Federal's Exterior Method is the safest way to repair the Building. Construction would occur outside of the Building and away from the students.

17. Federal's Exterior Method would take approximately only twelve weeks to complete.

18. Federal's Exterior Method is likely to be approved by the New York City Department of Buildings (the "DOB").

19. However, the Award is based on Coral's untested plan to repair the Wall from the inside of the Building (the "Inside-Out Method").

20. In my fifty years of experience with construction of all types including specific construction of walls, I have never heard of an exterior weather wall being constructed using Coral's Inside-Out Method.

21. At the first appraisal meeting, I asked Coral for construction details depicting how the Inside-Out Method would be performed.

22. Specifically, I requested details depicting exactly how the copper panels would be set in place, joined to each other, and to the existing EIFS Wall and primary structure that remained.

23. Despite repeated follow-ups, Coral never provided any such detail.

24. By email dated April 23, 2018, I informed the umpire:

> For any of us to challenge the owner we first must understand the construction details and installation approach of the owners proposed solution. ***Despite my repeated requests, I have not been provided with any information upon which I can make an informed evaluation. This is an error in the process***. The one page 'cut sheet' that has floated around is grossly insufficient. If the owner has a qualified bid from a wall contractor who can describe the system and confirm a guarantee, it should be made available for review. I am not aware any such proposal exists.

(emphasis added). A true and correct copy of the April 23, 2018 email is annexed hereto as **Exhibit "4."**

25. To date, Coral has provided no construction details explaining how the Inside-Out Method could be performed.

3

26. In fact, my consultant, Daniel Hogan formerly of CCA Group, advised me that it is physically impossible to construct a wall using the Inside-Out Method.

27. I provided evidence to the Panel that it is not possible to construct a weatherproof wall using the Inside-Out Method.

28. The Inside-Out Method would be significantly more dangerous than the Exterior Method.

29. Under the Inside-Out Method, the construction activities would occur inside of the Building, closer to the students who occupy the Building.

30. Further, the Inside-Out Method is unestablished, rendering it unlikely to be approved by the DOB.

31. Demolishing the neighbor's concrete structure using the Inside-Out Method could place the students in peril, as it would risk disturbing the stability of the neighboring structure without the ability to temporarily control or restrain it during the demolition process.

32. Despite the overwhelming evidence that the Exterior Method is the only viable repair option, Coral's appraiser demanded that only the Inside-Out Method be valued.

33. By email dated August 9, 2017, Coral's appraiser wrote to the Panel: "The Coral policy does not insure [the neighbor]. I will not agree to any investigation for access from any location other than [the Building]. Coral has total control of their property and needs no outside interference with the repairs to their own building." A true and correct copy of the August 9, 2017 email is annexed hereto as **Exhibit "5."**

34. Coral steadfastly refused to value the Exterior Method.

35. Because of Coral's petty refusal to cooperate with its neighbor, the Award failed to value the Exterior Method.

36. In addition to being unsafe, the Inside-Out Method is also unnecessarily expensive.

37. Under the Inside-Out Method, the construction would take fifty-two weeks to complete, according to Coral's experts and estimate documents, as opposed to twelve weeks under the Exterior Method.

38. Under the Inside-Out Method, construction activities would occur inside of the Building's north stairwell, adjacent corridors, and living spaces. Thus, during repairs, these areas would be closed. Elevators and another stairwell would remain available for use.

39. The Award includes a multi-million-dollar, temporary stair tower (the "Tower").

40. Coral advised that the Tower is required by the building code to provide a second means of emergency egress during repairs while maintaining convenient student movement within the Building.

41. Coral's executive, David Podolsky, actively participated in the appraisal alongside Coral's estimator, Ken Wilson, all but supplanting Coral's selected appraiser, Charles Murray.

42. An impassioned, *ex parte* plea by Coral executive David Podolsky to the Panel increased the scope of the Award.

43. With regards to the Tower, Mr. Podolsky made a highly emotional appeal to the Panel to consider *convenience* of the students.

44. Mr. Podolsky argued that the students are entitled to have the temporary Tower fully *air-conditioned*, heated, and ventilated, and lead directly to the lobby.

45. During the approximately twelve weeks of repairs using the Exterior Method, students could continue to use the existing staircase, except for a matter of a few days when the temporary protection wall, interior drywall, and paint would be installed.

46. A steel barrier erected on the interior side of the Wall would ensure student safety during construction. This would have four benefits. First, students would be fully protected from any debris, impact, or other hazard associated with demolition or reconstruction. Second, there would be no disruption to students, because the existing staircase would remain fully usable. Third, dust and noise occurring inside the Building would be significantly reduced. Finally, there would be significant cost savings.

47. Thus, use of the Exterior Method would obviate the need for any temporary stairway.

48. Even assuming *arguendo* that a temporary staircase were required, the Tower is grossly disproportionate to the DOB requirements.

49. A steel frame staircase, covered with a temporary roof and secured with netting, would ensure student safety and comply with all requirements (the "Steel Staircase").

50. Steel Staircases are routinely used in construction projects throughout New York.

51. The Tower vastly exceeds any building code requirements. For example, the Tower would be air conditioned despite being a mere secondary means of egress. No law or ordinance mandates air conditioning a secondary means of egress.

52. Further, the Tower would require sidewalk excavation to support it. The Steel Staircase would be perfectly secure and require no excavation of NYC sidewalks.

53. The Tower exceeds those costs necessary to comply with the minimum requirements of the building code.

54. However, as a result of Mr. Podolsky's plea, the umpire irrationally included the expensive, air-conditioned, temporary Tower in the Award.

55. The Award includes approximately $2,176,888 for the Tower, broken down as follows: electrical (approx. $38,000 (20% of $190,000)), exterior/general ($13,500), exterior stairway ($400,000), demolition – front ($110,000), demolition – remove stairway ($100,000), HVAC ($500,000), scaffolding ($300,000), site work/excavation ($25,000), associated general conditions (approx. $204,287), associated overhead and profit (approx. $338,157), and associated tax (approx. $147,944).

### Coral's Injection of a New Claim into the Appraisal

56. Coral also injected a new claim into the appraisal process.

57. On April 16, 2018, Coral's estimator, Ken Wilson, reported a new claim of water damage *directly to the Panel*: "Due to heavy rains yesterday and this morning the building . . . took on water in several areas of the building."

58. I advised the umpire that this new claim must be submitted through normal reporting channels, and should *not* be considered in the appraisal.

59. However, the umpire considered this new claim to increase the scope of repairs.

60. By email dated April 23, 2018, the umpire advised: "Given the recent water penetration in the building, I am less willing than I previously might have been to consider removing the first floor from the scope . . . ." A true and correct copy of the April 23, 2018 email is annexed hereto as **Exhibit "6."**

### Pressuring the Umpire

61. In addition, Coral tried to engage in settlement discussions rather than complete the appraisal.

62. In January 2018, Mr. Podolsky made pleas—to me individually, to me together with the umpire, to the Panel, and to the other experts assembled for the meeting—to "settle."

7

63. The umpire then encouraged Mr. Podolsky and me to discuss settlement.

64. I was there to appraisal the loss and had no authority to discuss settlement.

65. The umpire subsequently informed me, on multiple separate occasions, that he was feeling "pressure" to end the process.

66. I advised the umpire that he should not be feeling any pressure.

67. Shortly thereafter, the umpire accepted Coral's estimate of the loss—with some arbitrary, unexplained reductions—and issued the Appraisal Award.

68. The umpire never explained his calculations that gave rise to the value of his Award.

69. From a review the Award and its attachments, it is impossible to ascertain why the umpire reduced line items of Coral's estimate.

70. I do not see a rational basis for these adjustments.

### Failure to Consider My Evidence

71. The Panel also failed to consider evidence I provided.

72. I advised the umpire that the costs Coral estimated for scaffolding were so inflated that they must be erroneous.

73. On April 6, 2018, I advised the umpire:

> [A]s an expert in construction I can say that a 15' swing stage as a matter of standard industry practice typically rents for approximately $6,000 per month. In addition to the rental there are delivery and removal charges of approximately $3,000, set-up and dismantle charges of approximately $8,000, and if an operator is included for 4 days, $4,000. . . . .
> If you are persuaded to recommend a value other than described above, kindly share with us the specific facts, data, or reasoning that form the basis of your opinion.

74. ***The umpire never explained his reasoning.***

75. Upon receipt of the Award, it included Coral's $512,000 scaffolding estimate, which was arbitrarily reduced to $300,000 without explanation.

76. Coral's claim includes $214,135 for electrical labor and materials. The umpire arbitrarily reduced that claim to $190,000, with no explanation of factors he considered.

77. By email dated April 27, 2018, the umpire admitted with regards to the Extra Expense portion of the Award: "I eliminated any expense that *appeared to be* related to litigation or advocacy as opposed to consulting (and then *I discounted a bit*)." (emphasis added). A true and correct copy of the April 27, 2018 email is annexed hereto as **Exhibit "7."**

78. Further, Coral's claim includes $1,042,995 for the construction of the Wall using the untested, untried copper wall system. The umpire reduced that claim to $900,000, again with no explanation.

79. Although the Award states otherwise, the repairs included in the Award *are* subject to depreciation. Multiple items in the Award would better the property.

80. For example, the Appraisal Award includes, *inter alia*, a new HVAC system, repainting the Wall through the sixteenth floor, and a superior copper wall system to replace an old EIFS wall.

81. I advised the umpire that the copper wall system would be a significant upgrade to the existing EIFS Wall. Further, it is significantly more expensive than an EIFS wall.

82. The Award includes $900,000 for construction of a new, copper-panel wall using Coral's Inside-Out Method, plus approximately $417,995 for associated markup.[1]

83. The Award includes $725,000 for demolition of the Wall using Coral's Inside-Out Method, $50,000 for associated materials, and $75,000 for debris removal, plus approximately

---

[1] "Associated markup," as used herein, refers to a proportional percentage of the amounts awarded for general conditions, tax, and overhead and profit.

$394,773 for associated markup. Coral's Inside-Out demolition is unsafe, as it would risk disturbing the stability of the neighboring structure. It is also unnecessary.

84. The Award includes $75,000, plus approximately $34,833 in associated markup, to remove *one thousand cubic yards* of concrete debris.

85. The hypothetical maximum amount of concrete debris that could ever be generated under the Inside-Out Method is *less than sixteen cubic yards*. This hypothetical maximum would only be reached if the four inches of space between the Building and its property line, and floors 2, 3, 4, and part of 5, were 100% filled with concrete—which they are not.

86. Based upon my physical inspection of rooms 307 and 407 of the Building, it is evident that a very small portion of the Wall is impacted with concrete.

87. The Appraisal Award includes $300,000 for scaffolding, plus approximately $139,332 for associated markup. This unexplained figure contradicts the evidence, as detailed *supra* ¶¶ 72-75.

88. The Award includes $13,500 for a new Duane Reade sign to be used during repairs, plus approximately $6,270 for associated markup. This expense is unnecessary. Coral could mitigate this expense by using a temporary sign during repairs.

89. The Award includes $24,765 for off-site storage, plus approximately $11,502 for associated markup.

90. The Award includes $225,000 for post-construction cleaning, plus approximately $104,499 for associated markup. At a minimum, this amount is substantially duplicative with the $500,000 in "general conditions."

91.     The Appraisal Award includes $500,000 for undefined "general conditions," plus approximately $143,750 for associated tax and overhead and profit. The umpire never explained how this figure was calculated or why it was awarded.

92.     The Appraisal Award includes $362,098 for tax, calculated at an 8.75% rate. I informed the umpire that New York City will tax only the materials utilized in the repairs. The umpire ignored me, and awarded tax on the full cost of repairs.

93.     The Award includes $827,653 for overhead and profit, calculated at a 20% rate. At a minimum, this amount is substantially duplicative with the $500,000 in "general conditions."

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 12/20, 2018

_____
Wayne W. Martin

11