UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

CORAL REALTY, LLC, and CORAL          Docket No.: 1:17-cv-01007
CRYSTAL, LLC,

                Plaintiffs,

                        **DECLARATION OF CHARLES MURRAY**

   -against-

FEDERAL INSURANCE COMPANY,          Judge Deborah A. Batts

                Defendant.
--------------------------------------------------------x

Charles Murray, deposes and states the following under penalty of perjury:

1. I was appointed by Plaintiffs (hereinafter Coral) to serve as their appraiser by letter from Karl Denison dated May 4, 2016. A copy of my resume is annexed hereto as Exhibit "1" evidencing my forty plus years of experience, inter alia, many of which were as a General Adjuster for insurance companies.

2. I affirmatively advise the court that there was no fraud, bad faith conduct (on behalf of Plaintiff), nor misconduct (on behalf of Plaintiff) in the appraisal process. I also state that the Appraisal Award did not include the estimate of A.C.N.Y. Developers: I refer to such estimate as as Ken Wilson's estimate.

3. I believe that there is as well no necessity for I or Plaintiff to respond to the factual issues and alleged errors claimed to exist by Defendant and its counsel. I am nevertheless responding in a cursory manner, in order for the court to have a fuller flavor of the matter.

4. I have been advised that the original appraiser appointed by Defendant was declared ineligible by New York State Supreme Court. Wayne Martin was next appointed. He and I communicated April 25, 2017 at which time he advised he had no documents from Defendant.

5. Wayne Martin and I had a conference call with Michael Young on May 5, 2017. Martin repeated that he had no documents from Defendant. Martin and Michael Young agreed that I would prepare a binder including all relevant documents concerning the claim.

6. The appraisal panel's umpire, Martin and I scheduled a June 6, 2017 meeting. Prior to the meeting I prepared a binder containing the detailed estimate of Ken Wilson (Atlantic) which has details and a recap by category of all claim components, copies of surveys evidencing the intrusion of concrete into Plaintiff's premises, the estimate of Defendants, and all claims data relevant to the appraisal from both parties.

7. For this meeting Michael Young had requested the parties to advise of the names of the individuals who would be appearing at the initial session, both to facilitate entry into the building in which JAMS has its New York City Offices, and to further the appraisal process.

8. The panel had set aside five hours for the session! Pursuant to the request of Michael Young I advised that I would be appearing with Ken Wilson, Plaintiff's contractor/building expert, and Steven Harwood, Plaintiff's engineer; we all came prepared with our files, the reports of Defendants, and were prepared to proceed. Martin came with an umbrella, and nothing else, and stated he had to leave in an hour. Martin professed not to have received any documents from Defendant a month after our conference call, and had not really looked at the binder I had prepared which included Defendant's position on the claim. He then stated: "I guess I'll have to hire some experts."

9. We next met in Philadelphia to accommodate Mr. Martin. At such meeting in July 2017, I began by inquiring of Martin if he and I could agree upon any scope and/or dollar figures. He responded by advising: "I have not been given any dollar authority yet."

10. The following month, when the panel met again on August 22 2017, Martin stated the Defendant would "pay zero dollars." Martin requested that Defendant be provided access to the materials I provided to the panel. Martin also stated that Defendant should not be paying for the damages, but rather that the adjoining building owner should pay for everything.

11. I appeared at the August appraisal session with Steven Harwood, Plaintiff's engineer, and Ken Wilson, Plaintiff's estimator/contractor. Martin attending with Ken Quigley and Dan Hogan from CCA, Chris Dollbaum and Tomer Saar from DBI (Defendant's estimator/contractor) and counsel for Defendant, Brian Lustbader, from the firm Schiff Hardin.

12. The panel was presented with the positions of Messrs. Harwood and Wilson. Defendant's team was afforded the opportunity to question them on all aspects of the work, including, inter alia,"inside-out" method, the costs, other possible approaches, the sequencing of the work, and the time frame for such work.

13. Martin would not agree upon any scope or any dollar figures. Other than his offer of "$0.00." For such meeting Martin requested a large screen for his PowerPoint presentation. He presented Defendant's proposal for an emergency staircase, which included using scaffolding and plywood! Wayne Martin offered plans at the appraisal including what is annexed hereto as Exhibit "5." Such scaffolding is not an acceptable means for students to use as a secondary means of egress.

14. Defendant approached the appraisal process by attempting to by-pass such process. Defendant waiting until after Plaintiff presented its claim to submit its analyses.

15. When the panel next met October 2, 2017 we had a four hour session. Thereafter I communicated with Martin in November when I advised him that parts of his assertions were

predicated upon inaccurate measurements and information. In fact, Martin continued to present plans with inaccurate information after being advised that same were inaccurate and after the adjacent property owner's representatives acknowledged that its plans, the ones offered by Defendant, were inaccurate.

16.The plan submitted by Martin could not work because the corridors were not sufficiently wide. At a meeting of the appraisal panel Michael Young personally viewed and verified the inaccuracies in the plans offered by Defendant. Such was as well confirmed with personnel from the City of New York's BEST squad. Michael Young requested consent of the appraisers to have Feuerborn contact the BEST squad; we consented and Feuerborn reported back.

17. On January 24, 2018 the entire panel met again for a four hour meeting starting by inspection of Coral's building. Daniel Hogan, architect for Wayne Martin, appeared at this meeting in order to conduct further non-invasive testing.

18. January 2018 was when Thornton-Tomasetti responded to the information provided, commented upon the "impact-echo" test results performed at Coral's building in an effort to ascertain the degree and extent that the neighboring property owner's work intruded into and damaged Coral's building.

19. Defendant's alleged expert Daniel Hogan was involved with exchanges of emails concerning the testing and efforts to ascertain the above information concerning the damages caused and responded to Thornton-Tomasetti and the panel through Wayne Martin. Provided were a graphic analysis of Hogan (CCA), and compilation of data from surveys by two different companies as regards the intrusion caused by the adjacent construction.

20. In short, while the panel considered the information and data Martin presented, same was ultimately found lacking by Feuerborn, Michael Young and I.

21. Included among the papers and materials utilized in reaching its award, the panel as well considered the Proposed Lot Line Detail (attached hereto as Exhibit "4"), Harwood's plans; plans of C3D Architecture, stairs, the inside-out method, siding system, and the warranties of ALBA , the company who agreed to provide a warranty for the work to be performed.

22. The entire panel met at the site on June 6, 2017 to inspect and tour the building; we then departed and went to the offices of JAMS in midtown.

23. Martin stated that he had not prepared anything to share with the panel, professed not to have read any part of the binder submission I had assembled and claimed not to have received anything from Defendant Federal.

24. Wayne Martin advised that he could not fully participate in the appraisal for he had not received authority from Defendant for any dollar figures! While appraisers and their clients may communicate, it is improper for either party to direct and control their respective appraiser in the performance of his/her role as an appraiser.

25. Wayne Martin and I exchanged the following emails detailing the above:

**From:** Charles Murray [mailto:cmurray012@aol.com]
**Sent:** Thursday, July 27, 2017 12:15 PM
**To:** waynewmartin@aol.com
**Cc:** 'Charlie Murray' <CMurray012@aol.com>
**Subject:** RE: July 26 appraisal meeting

Wayne.

I really wish to proceed with this appraisal. You advised, yesterday, that Chubb had not yet provided you with the authority on any of the specific numbers. When will you have authority from Chubb to agree on the numbers of any of the items?

Charlie

# FOUR POINTS CLAIM SERVICES, INC.

## Charles H. Murray, Jr.

*Insurance Consultant – Appraiser – Umpire -Commercial & Residential Claims*

4720 Water Park Drive, Unit H

Belcamp, Maryland 21017

(443) 903-1731

CMurray012@aol.com

Such email preceded the following exchange:

**From:** Wayne Martin [mailto:waynewmartin@aol.com]
**Sent:** Friday, July 28, 2017 7:57 PM
**To:** Charles Murray <cmurray012@aol.com>
**Cc:** Michael D. Young <myoung.jams@gmail.com>
**Subject:** Re: July 26 appraisal meeting

OK. Should we cancel the meeting on the 22nd? My contact at Chubb should be back from vacation next week and I intend to review it with him. But until I get approval maybe we should postpone the proceeding. Your call.

Sent from my iPhone

Mr. Martin wrote the foregoing email after I had written, on Jul 28, 2017, at 5:22 PM:

Wayne.

Until you get authority from Chubb we should not proceed.

Charlie

# FOUR POINTS CLAIM SERVICES, INC.

## Charles H. Murray, Jr.

*Insurance Consultant – Appraiser – Umpire -Commercial & Residential Claims*

4720 Water Park Drive, Unit H

Belcamp, Maryland 21017

(443) 903-1731

CMurray012@aol.com
Tax ID: 81-2109898

26. The panel met numerous times from 2017 through 2018, culminating in the issuance of the appraisal panel's award in April 2018. Individuals with knowledge did present to the panel. Wayne, I and Michael Young as well met at the offices of JAMS, different meetings at the premises, and in Philadelphia, Pennsylvania. The panel hired a neutral engineer, James Feuerborn from Thornton-Tomasetti, heard evidence from witnesses, including David Podolsky from Coral Realty, Plaintiff's and Defendant's engineers, Plaintiff's and Defendant's contractors, DBI, Defendant's contractor/builder by a few individuals, and others.

27. Michael Young encouraged both sides to offer whatever evidence they wished to proceed and requested to hear from David Podolsky, for Mr. Podolsky had knowledge of the events not known to any of the other witnesses; Wayne Martin consented to having David Podolsky offer his thoughts, facts and opinions.

28. I am unaware of any fraud, bad faith or misconduct with regard to any aspect of the appraisal except for conduct and actions by Defendant and its representatives. See below where Michael Young states that Defendant's contractor's proposal "seems both unrealistic and reflective of an effort to bid intentionally low." When the appraisers and Michael Young met, Wayne Martin declared that Defendant would offer $0.00, nothing as what it believed to be its obligation under the policy. He added that Coral should go and get its money from the owners of 133 Third Avenue.

29. The panel was given the task of coming to agreement (two out of three panel members are required to reach agreement for an award) based upon what was offered.

30. There was no fraud, bad faith or misconduct which existed, or with which Plaintiff had any involvement.

31. I recognize that Defendant has attempted to raise numerous issues apparently in an attempt to create a factual issue. Were efforts such as that by Defendant herein to succeed, every appraisal would simply be one of the barriers insureds needed to pass in order to collect on the benefit of their contract.

32. The panel considered all offers made by witnesses and documents and materials presented. I have now seen, for such had not been provided to me, April 2018 exchanges between Michael Young and Wayne Martin. Exhibit "6" to Defendant's motion. The exchange reflects that Michael Young explained (even though not under an obligation to do so), why he did not believe Defendant's offers valid.

33. The email shows Michael Young offered Wayne Martin the opportunity to offer further information or arguments, while stating, appropriately, that the appraisal needed to come to a conclusion. Defendant's motion papers evidences that Wayne Martin responded.

34. Salient portions of such email, which Michael Young expressed his views, and with which he stated James Feuerborn of Thornton-Tomasetti was in agreement, include:

> I think the owner was persuasive in his argument that the non-invasive testing that was done was not determinative in that the large middle section of each wall was not tested and that it is in these sections that it is likely that there is concrete intrusion from 133 into 129.
> Finally, I note that I have discounted some of the numbers presented by the owner with respect to the cost of the demolition to take into account some the (sic) points that you have raised regarding calculations regarding the area of demolition and volume of concrete.
> As for cost, bottom line is that I did not find the Panzer bid as credible as the ALBA bid.

35. The foregoing reflects thoughts of Michael Young and one of the explanations, among others that he included in his email to Wayne Martin. Michael Young did explain as well

to me his thoughts with regard to his suggested figures. Eventually Mr. Young and I agreed upon the figures.

36. Attached to and comprising part of the award is the listing of "incurred expenses," being Schedule 5 of Rollins Accounting.

37. Such Exhibit "6" as well includes Michael Young's conclusion that (a) Defendant's the proposal by Panzer, Defendant's proposed contractor, was not as credible as that of Plaintiff's contractor; (b) that Panzer had not been demonstrated to have done much work in NYC, or to have experience in projects such as the project envisioned; (c) and that Panzer's assumption about doing work on all floors at once was "not a reasonable assumption."

38. The email as well recited that Panzer had "no allowance for a site safety engineer and only assumes 'broom cleaning' near the wall at the end of each day–and not a broader, more comprehensive cleaning effort.

39. Tellingly, Michael Young also found potential misconduct by Panzer (and Defendant?). Young's email states: Panzer's:

> assumption that it will cost $12,000 to demo the west wall–including a scaffold bridge--
> seems both unrealistic and reflective of an effort to bid intentionally low.

40. Number "2" of Michael Young's email reflects as well the studied approach he took to addressing the claims and his rationale. Such number "2" reads:

> As for the north wall, I have struggled with this issue as I share your concerns about the high cost (and I also respect your particular expertise in this area of construction). But, over time, James and I have used your arguments to challenge the owner. But it appears that the owner is correct that its proposed approach is the only approach which is both feasible (given lack of access) and ensures watertightness, and is the only approach for which a contractor will give a guarantee regarding watertightness. James and I have explored with TT staff and the owner various alternatives --including the use of other materials, such as CMU or pre-fab materials, as well as the approach suggested by you –

but at the end there is always a concern regarding feasibility (given the small space within which the work needs to be done) and/or whether a contractor will guarantee the approach you suggest. In the absence of such a guarantee, the owner deserves the benefit of the doubt.

I have appreciated all of your efforts and have been pushing back on the owner and his appraiser for months now to give you the space to explore and suggest alternative scopes. I have analyzed and have asked my consulting engineer to analyze all of the alternatives you have suggested and all of the points you have raised. But I now agree that it is time to bring the appraisal to an end. I am therefore pretty firm on the spreadsheet I sent you yesterday, unless you point out an obvious error.

41. As this email reflects, Michael Young, James Feuerborn, and I all agreed that Plaintiff's proposed "inside-out" method of performing the repairs was the only viable option presented, for Defendant's proposed method was found not to be feasible.

42. Among other arguments of Defendant, its counsel has proffered two conflicting arguments. The first being that the panel refused to consider Defendant's offers. The second being that Defendant was not offered the opportunity to explain its exterior method. These two inherently conflicting claims are belied by the record. I as well state that the claims are categorically untrue. Wayne Martin and the witnesses he offered to the panel were afforded the opportunity to explain Defendant's proposed exterior method. Such method was found not to be feasible or realistic.

43. Further, many of the items and information submitted by Martin were in error and unreliable. For example, Martin presented plans regarding work to be performed inside the existing stairwell showing measurements of the stairwell that were inaccurate. The inaccuracies of the measurements precluded performing the work as Martin proposed.

44. There was never any pressure applied to "settle" the appraisal. Rather, requests were

made to reach an ending of the appraisal process. Towards such end Michael Young's email, Exhibit "6" to Defendant's motion, explicitly said: "it is time to bring the appraisal to an end."

45. The email transmitted from Michael Young to Wayne Martin evidences that the panel was provided with the rebuttals made by Wayne Martin. This email had not been shared with Plaintiff or Plaintiff's appraiser. The email evidences as well that the numbers presented by Plaintiff were discounted by the umpire (and to which I agreed) based upon the arguments of Wayne Martin!

46. Ken Wilson's estimate with a detailed description of the work to be performed on each floor, at each location, the quantities of materials and costs were provide to the appraisal panel. The claims made by Defendant that there were no details is preposterous considering the details of Ken Wilson's estimate. Details provided included plans by C3D Architecture regarding the stairs and the "inside-out" method," the siding system, warranties and lot-line details, as well as the scope of work designed by SR Harwood Consulting Engineering, P.C. Each and every one of these items were presented to the appraisal panel.

**Purported Errors**

47. It is respectfully submitted that addressing the facts underlaying the appraisal award is unwarranted. There was no fraud, bad faith or misconduct.

48. Nevertheless, I feel compelled to briefly respond to the unfounded allegations of Defendant.

49. That the panel found that the inside-out method was the only feasible method of performing the repairs is not an error. Such was supported by the offering of Plaintiff, of Ken Wilson and Steven Harwood, P.E., and accepted and adopted by Michael Young and James

Feuerborn, P.E. . Mr. Feuerborn was the Thornton-Tomasetti engineer selected by Michael Young (and agreed to be by the appraisers), to assist Michael Young in his position as umpire.

50. The dollar figures submitted with regard to the first two asserted errors by Defendant were supported by calculations and were subject to strict scrutiny. General Conditions and Profit and Overhead are appropriately included in awards, and have been included in claims in my greater than forty years of experience in the insurance field.

51. With regard to scaffolding, purported error 3, the figures presented were not unexplained. As reflected by Ken Wilson's estimate attached to the appraisal award, details were provided on a floor by floor basis for items claimed, and the scaffolding is included in such estimate at page 37. Note too, the claim was presented at $512,500 for scaffolding whereas the award accounted for the sum of $300,000 to be included. I agreed to such figure after discussions were had concerning what we on the panel believed appropriate.

52. Demolition and debris removal costs were listed as yet another error. Defendant argues that the panel was swayed by David Podolsky to include the demolition of the first floor wall into the appraisal and that such "sway" amounts to misconduct. As noted, such information solely evidenced the damages caused by the construction activities which formed the basis for Plaintiff's claim.

53. From the outset of the appraisal the panel was advised that the walls in Plaintiff's first floor becoming wet and damages occurring caused by the construction activities next door. The panel was made aware from the outset of the appraisal that there were cracks noted in the first floor, that the metal door to the basement from the lobby would not close due to cracks due to the building being pushed in due to the construction next door. That a large water intrusion occurred

solely evidenced that Plaintiff's assertions were valid. Such intrusion evidenced that Plaintiff's building was not watertight.

54. I specifically advised Michael Young in September 2017 that there was water intrusion coming into Coral's property caused by the claim which is the subject of the appraisal. Michael Young encouraged Martin and I to discuss the differences between us and to attempt to come to an agreement. Martin and I tried without success, which necessitated that Michael Young, as umpire, weigh in. Such is how appraisals are conducted.

55. Defendant's unsupported allegation that the award included any costs for the latter water "claim" of Coral Realty is not true. The panel did consider that water entered into the building, at the first floor lobby and into the basement, as evidence that the construction activities performed at 133 Third Avenue did affect Coral Realty's building. The water intrusion evidenced that the building had suffered damage. Such was addressed in the email sent by Michael Young to Wayne Martin, (Exhibit "6" to Defendant's motion). That the wall at the first floor was damaged, as well as floors above, supported Plaintiff's assertion that such floor needed repair!

> In such regard such email includes: " . . . over time James [Feuerborn] and I have used your arguments to challenge the owner. But it appears that the owner is correct that its proposed approach is the only approach which is both feasible . . .and ensures watertightness, and is the only approach for which a contractor will give a guarantee regarding watertightness. James and I have explored with TT staff and the owner various alernatives – including the use of other materials, such as CMU or pre-fab materials, as well as the approach suggested by you – but the end is there is always a concern

regarding feasibility . . .and/or whether a contractor will guarantee the approach you suggest.

56. No dollar figures were included in the award occasioned by the latter water intrusion. Nevertheless, that the intrusion occurred did lead Michael Young to advise Wayne Martin that such was a factor he was appropriately considering in the scope of the demolition.

57. Indeed, Wayne Martin consented to the inclusion of the first floor into the scope of damages! See Exhibit "4" to Defendant's motion. Martin wrote (second paragraph under "1"): "The photos are likely a false impression, but we will move past that and agree to demolish the first floor."

58. With regard to the sixth purported error, inclusion of invoices from A& B Engineering Land Surveying, P.C., the amounts the panel deliberated and found the amounts of such invoices included in the award to be appropriately within the scope of loss and caused by the work next door. We found that A&B Engineering Land Surveying, P.C.'s fees for attending in court were properly included for such expenses were incurred to protect the property from further damage (concededly covered by the policy, see Policy, Defendant's motion Exhibit "1" at pages 68 and 79 of 201). A&B was represented to have appeared in court on an Order to Show Cause to stop the construction from causing further damages. See as well Rollins schedule 5 attached to the award (Defendant's motion Exhibit "3") evidencing the fees for such appearance in the sum of $1,600.

59. Steven Harwood's invoices were as well found by the panel to be appropriately included and loss related. In this regard it should be noted that (a) his invoices were discounted by the panel by approximately 15%; and (b) that the policy provides coverage for the costs

incurred to prepare claims (see policy, Defendant's motion Exhibit "1" at page 155 of 201).

60. The numbers included in the appraisal award are at variance with the figures in the claim and in Ken Wilson (Atlantic) estimate. The numbers vary because after discussion and analysis two out of three of the appraisal panel members came to an agreement that the figures agreed were fair and appropriate considering the information presented at the appraisal.

61. Harwood's invoices and Extra Expenses included in the award were as well challenged by Defendants. We repeat that after the appraisal is concluded, the fact that one of the three panel members did not agree with amounts properly found by two other panel members does not give the dissenting member, or his/her client, the right to challenge or raise the issue again.

62. The appraisal panel found such the amount of Harwood's invoices, and the Extra Expenses incurred, to be properly included in the award, appropriate and incurred as a result of the loss. The panel did not accept the full amount of such invoice; the figure included in the award for Harwood's invoices were reduced by approximately 15%. Michael Young explained his rationale for his thoughts in reducing numerous portions of Plaintiff's claim. (See Exhibit "6" to Defendant's motion). When I agreed with such figures such amounts were included in the appraisal.

63. The extra expenses incurred as set forth as errors in Defendant's motion, number 8, were found by the panel to be properly claimed as incurred, directly related to the loss and within the scope of expenses Plaintiff necessarily incurred as a result of the loss. Such are detailed on Schedule 5 of Rollins Accounting included as part of the Appraisal award. Again, without fraud, bad faith or misconduct, second-guessing as to whether the panel was right or wrong with its

judgment about the amount of such figures is inappropriate.

64. Defendant is conflating issues and facts concerning the amount included in the award (error ascribed to as "9") concerning the Duane Reade sign. The sum included is but a fraction of what the cost to replace it would be. The dollar figures set forth on Ken Wilson's estimate (at page 33 part of Exhibit "3" to Defendant's motion.) was to remove and reset the sign. Such costs did not include replacement!

65. No issue of coverage existed for such sign in that the policy provides coverage therefore (Policy, Defendant's motion Exhibit "1"at p 46 of 201, Form 10-02-1903, under **3. Outdoor Signs**). Expenses incurred, including those to safeguard the premises, temporary scaffolding, and specifically to protect the premises to maintain heat and to prevent freeze-up of the sprinkler system are covered. See policy Form 10-02-1724 entitled: "**PROTECTIVE SAFEGUARDS–HEAT MAINTAINED.**" Exhibit "1" to Defendant's motion at page 31 of 201.

66. Claimed error number 10, "off-site" storage and its related expenses were based upon the estimate of Ken Wilson, pages 37-38, part of Exhibit "3" the appraisal award. As with the other items Defendant claims they are unclear, all Defendant needs to do to become clear is to look at the exhibit it provided to the court.

67. At the referenced pages Ken Wilson provided:

Off Site Storage to include:
1) off site storage for the following items to be re-installed after necessary structure repairs have been completed (affected windows, doors, heating units, garbage chute doors and A/C unit on lower roof above entry way) for 1 year. The terms of the storage will be adjusted as per the length of the project. Includes packing out and protection of said items prior to being moved off site

2) 4 large units x 12 months (actual storage duration to be determined)

68. That Defendant claims that it is unclear what such figures represent is indicative of Defendant's approach to the appraisal, the claim process, and apparently this litigation.

69. Ken Wilson's report, although modified, were nevertheless found by the panel to be more in line with Plaintiff's claim than Defendant's position. I and Michael Young agreed upon the figures set forth in the appraisal.

70. Note, Michael Young found Defendant's asserted figures for cleaning to be inadequate (see Defendant's motion Exhibit "6"). Defendant had provided solely daily broom cleaning. The panel, based upon the materials submitted and considered found that a daily broom cleaning would be insufficient. The building was occupied by NYU students who needed to continue to use their dorm rooms. Accordingly, the award included added cleaning expenses that are necessary as the result of dust penetrating the building, as well as content manipulation (moving belongings and personal property) that we found to be necessary, as well as off-site storage.

71. To be clear, the General Conditions' cleaning is **different** from the cleaning to be performed to address the infiltration of dust, and other cleaning post-construction.

72. General Conditions, being item # 12, asserted as an error, were properly included in building claims. Such represent expenses which are separate from the expenses of performing the actual construction work. Such expenses may be viewed as site management, material handling and project management.

73. General Conditions and Overhead and Profit are detailed in Ken Wilson's estimate at pages 39-40. Such are set forth as including: "Commercial Supervision/Project Management; Safety Monitor, General Laborer, Taxes, insurance, permits & fees. Such figures are properly

included in claims, and have been during the forty plus years I handled claims.

74. Concerning alleged error 13 for taxes. Taxes were included as being imposed on the costs of repair. In that there is no capital improvement to the premises it was the studied opinion and determination of the panel that the figure awarded for taxes was appropriate.

75. Lastly, Overhead and Profit are known to Defendant and its adjusters, presumably to its counsel, and assuredly known to Defendant's engineer, contractor and experts as an item distinct from General Conditions. Overhead and Profit were found by the panel to be appropriate based upon the submissions, based upon our experience, and predicated upon the loss suffered.

## Process

76. In addition to the numerous meetings we had, at the site, at the offices of JAMS in New York and in Philadelphia, where the three members of the panel met, and on one occasion just Wayne Martin and myself. Michael Young as well held break-out sessions where he met separately with James Feuerborn of Thornton-Tomasetti and each of the appraisers. It was upon the agreement among the panel, and agreed to by the parties, that Michael Young would retain James Feuerborn of Thornton-Tomasetti to assist Mr. Young.

77. Although we had break-out sessions, Wayne Martin was made aware of every item of information and every claim that was discussed in the break-out sessions. Michael Young had break-out sessions, in person and by email and telephone calls, inter alia, with the parties, engineers, and appraisers.

78. Wayne Martin, arrived at the first appraisal session, scheduled for five (5) hours, solely with an umbrella. Martin had not prepared anything to share with the panel, professed not to have read any part of the binder submission I had assembled, and claimed not to have

received anything from Defendant Federal.

79. Lastly, in that the panel believed that after the repair Plaintiff would not be any better off than it had been, the building would have, no new features, nor any capital improvements, the panel found, as set forth, that there was no betterment. Such reflected our finding that the Actual Cash Value of the loss was equivalent to the Replacement Cost Value of the loss. Such is common in building claims.

80. In arriving at the Actual Cash Value, the panel did consider that after the repairs the building would have no betterment. As well the panel considered that the building was being utilized as a dormitory for hundreds of NYU students, that the premises were fully occupied, we considered the age and condition of the building. To argue that we were unaware of such factors and did not consider them is inaccurate.

81. Note too, Federal elected not to offer any other factors to consider in reaching the Actual Cash Value. In that the panel considered all factors brought to the panel's attention, and no factors were refused to be accepted, any argument that the Actual Cash Value figure determined by the panel should not be honored is disingenuous.

82. Defendant's argument that the "convenience" of the students was considered as a factor at all is also untrue. The **safety** of the students was a major concern. To utilize the scaffolding proposed by Defendant would necessitate every student getting OSHA certified, for each student to be compelled to acquire hard hats, and harnesses.

### Tower

83. Defendant's suggest that the costs for the temporary "tower" included purchasing an entirely new air conditioning for the tower; that is inaccurate. What is included in the line items

of Ken Wilson's estimate (Exhibit "3" of Defendant's motion, estimate page 36) is HVAC, as per the bid from Nelson Air Device - Maspeth, New York, to 1) remove, relocate and re-install 6 wall mounted convector units presently in front windows of floors 2 thru 6, 2) remove A/C unit from the entry foyer roof and relocate on the roof temporarily and then re-install all units back to their original location, 3) supply and install all necessary ductwork for positive pressure and heat inside new temporary staircase, and 4) large crane for roof top units manipulation. Fire sprinklers areas need to be protected by maintaining heat.

84. To fully understand the need to remove and reset the air conditioners that already existed one must appreciate that the temporary "tower" that is to be built would be built above the existing lobby which has air conditioners sitting on its roof. Unlike the rest of the building whose roof is above the building's seventeen floors, the lobby's roof is just that, solely above the lobby. To build the tower above requires what is above to be removed.

85. Wayne never produced a valid repair or temporary exterior staircase priced plan. He did supply a priced plan that was rejected by Michael Young, James Feuerborn and myself as having a temporary exterior staircase that would be unsafe for New York University students and a repair method and pricing that would not work on this loss. I also state that there is no requirement that the panel waste its time and effort to price alternative methods of repairs that the panel finds not feasible. To the extent Wayne Martin wished to present figures in such regard he had free rein.

86. Herein, the umpire, the umpire's retained engineer, with input from other engineers in his firm, concluded that Defendant's proposed methodology could not work.

87. After considering the submissions from the appraisers, after Thornton-Tomasetti's

James Feuerborn was retained by Michael Young, and after Feuerborn consulted with other engineers in his office, Feuerborn advised that Defendant's proposed methodology was unacceptable and that Plaintiff's methodology was the only one that would work.

88. As well the panel discussed using aluminum instead of copper for the wall system. Due to the heat that would be required to weld the aluminum, and the dangers involved with the transmission of the heat through other parts of the building, arcing etc. Feuerborn, Ken Wilson, Michael Young and Charles Murray concluded that soldering copper was appropriate,

89. Defendant asserts that the award improperly includes costs incurred, and paid, to A&B surveying. We considered the costs of A&B, including its appearance at court, Such were properly included as part of Plaintiff's extra expense claim, The court appearance was necessary to protect the property from further damage–presenting the court with the facts for the court to consider on the Order to Show Cause to stop the construction from causing further damages. See as well Rollins schedule 5 showing such amount being $1,600.

90. The Extra Expenses are as set forth on Schedule 5 of Rollins Accounting, attached to and part of the Appraisal Award. Exhibit "3" to Defendant's motion .

Dated: New York, New York
January 28, 2019

Chareles Murray

20151/15J125.Ly3