UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

CORAL CRYSTAL, LLC and CORAL
REALTY, LLC,

              Plaintiffs,

      -v-                                        No.  17-CV-1007-LTS-BCM

FEDERAL INSURANCE COMPANY,

              Defendant.

-------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER

Plaintiffs Coral Crystal, LLC and Coral Realty, LLC (collectively, "Plaintiffs") commenced this action against Defendant Federal Insurance Company ("Defendant" or "Federal") in New York State Supreme Court in 2017, asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, failure to timely and properly adjust an insurance claim, declaratory judgment of liability, statutory damages under section 349 of the New York General Business Law, and appraisal and liability on any appraisal award.  Plaintiffs move pursuant to N.Y. C.P.L.R. §§ 7510 and 7601 to confirm an appraisal award rendered on April 27, 2018 (Declaration of David Karel ("Karel Dec.," Docket Entry No. 40) Ex. 10 (the "Award")).  Federal cross-moves to vacate or modify the Award.[1]  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332, and has considered the parties' arguments carefully. For the reasons stated below, the motions are granted in part and denied in part.

---

[1] These motions were previously referred to Magistrate Judge Moses for Report and Recommendation, by the late Judge Batts.  The undersigned hereby withdraws the reference of the motions.

BACKGROUND

The following facts are undisputed unless otherwise indicated.  This case arises

from an insurance dispute between Plaintiffs, who own a building at 129 Third Avenue in

Manhattan (the "Building") (Complaint ("Compl.," Docket Entry No. 1-3) ¶ 9; Karel Dec. ¶ 3;

Declaration of Gerard R. Rudoshko ("Rudoshko Dec.," Docket Entry No. 35) ¶ 3), and Federal,

which issued Plaintiffs a policy insuring them against property damage, loss of business income,

and other expenses arising out of "[d]irect physical loss of or damage to [the Building] caused by

or resulting from any Covered Cause of Loss."  (Compl. ¶ 8; Karel Dec. ¶¶ 3, 7; Rudoshko Dec.

¶¶ 3-4 & Ex. 1 (the "Policy") at ECF page 59 (Building and Personal Property Coverage Form,

§ A); see also Policy at ECF page 74 (Business Income (and Extra Expense) Coverage Form,

§§A(1), A(2)(b)).)

The Building is used as a dormitory for students attending New York University.

(Declaration of Wayne W. Martin ("Martin Dec.," Docket Entry No. 36) ¶ 7.)  On or about

December 5, 2012, construction on a property to the immediate north of the Building, at 133

Third Avenue, Manhattan, caused concrete to damage a part of the north wall of the Building.

(Award at 1; Compl. ¶¶ 11-12; Karel Dec. ¶ 8; Rudoshko Dec. ¶ 5; Martin Dec. ¶¶ 8-9, 86.)  On

February 21, 2013, Plaintiffs notified Federal of the damage, which Federal acknowledged was

covered to at least some extent by the Policy.  (Karel Dec. Exs. 3, 4; Rudoshko Dec. ¶ 6; Compl.

¶ 17; Answer (Docket Entry No. 10) ¶ 17 ("Defendant . . . affirmatively states that it has

acknowledged coverage for some of the alleged damages sustained to Plaintiffs' building.").)

On April 14, 2016, after the parties disagreed about the extent and value of

Plaintiffs' loss, Plaintiffs made a demand for appraisal under the Policy's appraisal clause.

(Karel Dec. ¶ 9.)  In pertinent part, that clause provides:

> If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the value of the property and amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding.  Each party will: a. Pay its chosen appraiser; and b. Bear the other expenses of the appraisal and umpire equally.  If there is an appraisal, we will still retain our right to deny the claim.

(Policy at ECF page 67 (Building and Personal Property Coverage Form, § E(2)); see also Policy at ECF page 87 (New York Changes, § H(1)).)

By letter dated May 6, 2016, Federal "agreed to appraisal" but "premised" that agreement on a requirement that "the appraisal include consideration of all potential repair methods," not only Plaintiffs' proposed method—which Federal refers to as the "Inside-Out" method, because it involves repairing the Building's north wall from the inside out rather than from the Building's exterior.  (Rudoshko Dec. ¶ 19 & Ex. 2 (the "May 6 Letter").)  Federal argued that a different method, which it called "an exterior repair," would be "the conventional, least costly, quickest, and most reliable method of securing a permanent repair."  (May 6 Letter at 2.)  Federal asserted that a "pending DOB [New York City Department of Buildings] audit procedure will likely determine whether or not the exterior repair option is available," and argued that, if it was available, "the insured will be obliged to avail itself of it" by securing physical access from its northern neighbor, "either through a license agreement negotiated and paid for by Federal Insurance Company, or by the insured applying to the court for a license to perform the exterior repair from the neighboring property[.]"  (Id.)  The May 6 Letter also noted that the "appraisal cannot decide issues of coverage," and asserted that "[b]y engaging in the

appraisal process, the insured and we would not be waiving . . . potential coverage issues."  (Id. at 3.)

Plaintiffs selected as their appraiser Charles Murray, an insurance consultant, appraiser, and umpire with four decades of experience, primarily as an insurance adjustor. (Declaration of Charles Murray ("Murray Dec.," Docket Entry No. 41-2) ¶ 1.)  Federal selected Wayne Martin, "a construction industry professional with over fifty years of experience[.]" (Martin Dec. ¶ 1.)  Appraisers Murray and Martin then selected attorney Michael Young, of Judicial Arbitration and Mediation Services, Inc. ("JAMS"), as the panel's umpire.  (Karel Dec. ¶ 14; Martin Dec. ¶ 6.)  The panel convened on at least five occasions between June 6, 2017 and January 24, 2018, and heard evidence from Plaintiffs' and Defendant's engineers and consultants.  (Murray Dec. ¶¶ 6-17, 26.)

On June 6, 2017, the panel inspected the Building and then met at umpire Young's office.  (Murray Dec. ¶ 22.)  Plaintiffs' appraiser Murray attended with Ken Wilson, Plaintiffs' "contractor/building expert," who had previously provided an estimate of Plaintiffs' claim to the panel, and Steven Harwood, Plaintiffs' engineer, who designed the proposed Inside-Out method.  (Id. ¶¶ 6, 8; see also Declaration of Ken Wilson ("Wilson Dec.," Docket Entry No. 41-4); Declaration of Steven Harwood ("Harwood Dec.," Docket Entry No. 41-5).)  On August 22, 2017, Plaintiffs' appraiser Murray again appeared with Wilson and Harwood, and Defendant's appraiser Martin appeared with Ken Quigley and Dan Hogan from Construction Consulting Associates, LLC ("CCA"), Chris Dollbaum and Tomer Saar from DBI Construction Consultants, LLC ("DBI"), and Defendant's counsel.  (Murray Dec. ¶¶ 10-11; see also Declaration of Daniel Joseph Hogan ("Hogan Dec.," Docket Entry No. 37).)  On October 2, 2017, the panel met for four hours.  (Murray Dec. ¶ 15.)  On January 24, 2018, the panel met for

another four hours, with Defendant's engineer Hogan, and again inspected the Building.  (Id. ¶ 17.)

During the appraisal process, umpire Young, with the agreement of the parties, retained third-party engineer James Feuerborn, a managing principal at Thornton Tomasetti, to assist him in his role as umpire.  (Murray Dec. ¶ 49.)  Feuerborn inspected the Building (Harwood Dec. ¶¶ 6, 10) and opined on the parties' potential repair methodologies.  (Murray Dec. ¶¶ 20, 34, 41, 55, 87.)

The parties continued to disagree about which repair methodology was appropriate.  Plaintiffs' engineer Harwood provided a protocol to "safely remove the concrete [from the neighboring structure] that damaged the 129 building and restore the 129 building and property back to [an] undamaged state," by working "from the 'inside' of the 129 building and working towards the 'outside.'"  (Harwood Dec. ¶¶ 7-9.)  According to Harwood, he reviewed his protocol with the DOB, as well as with neutral third-party engineer Feuerborn, and both "agreed" with his proposed protocol.  (Id. ¶¶ 8, 10.)  Defendant's engineer Hogan, however, concluded that the proposed Inside-Out method was "physically impossible" (Martin Dec. ¶ 26; Hogan Dec. Ex. 8), and appraiser Martin proposed an alternative method (the "Exterior Method") which, he claimed, would be the safest and fastest way to repair the Building's wall, and was "likely to be approved" by the DOB.  (Martin Dec. ¶¶ 14-18.)  Plaintiffs countered that Martin's plan "contained inaccurate information and dimensions," was "unrealistic and not feasible" (Wilson Dec. ¶ 21), that portions of his plan "were rejected by the NYC DOB" (Harwood Dec. ¶¶ 12-13), and that his plan depended on "performing the repairs from the premises of [Plaintiffs' neighbor] 133 Third Avenue," which Plaintiffs "could not and cannot provide," in part because they were "in litigation with 133 Third Avenue's owners and cannot

compel that they cooperate" and provide access.  (Declaration of David Podolsky ("Podolsky Dec.," Docket Entry No. 41-3) ¶¶ 6, 12.)

In an email to Martin dated April 23, 2018, four days before issuing the Award, Umpire Young wrote that, in his view, Plaintiffs' proposed methodology for repairing the Building's wall was the "only approach" that was both feasible and "ensured watertightness":

> As for the north wall, I have struggled with this issue as I share your concerns about the high cost (and I also respect your particular expertise in this area of construction).  But, over time, James [Feuerborn] and I have used your arguments to challenge the owner.  But it appears that the owner is correct that its proposed approach is the only approach which is both feasible (given lack of access) and ensures watertightness, and is the only approach for which a contractor will give a guarantee regarding watertightness.  James and I have explored with [Thornton Tomasetti] staff and the owner various alternatives—including the use of other materials, such as CMU or pre-fab materials, as well as the approach suggested by you—but at the end there is always a concern regarding feasibility (given the small space within which the work needs to be done) and/or whether a contractor will guarantee the approach you suggest.  In the absence of such a guarantee, the owner deserves the benefit of the doubt.

(Martin Dec. Ex. 6.)

On April 27, 2018, umpire Young issued the Award, signed by himself and Plaintiffs' appraiser Murray.  The Award stated: "We do hereby certify that, over the course of approximately one year, we have heard and seen all of the evidence offered by both the insured and the insurer, including multiple proposed scopes of work and methodologies of the work, and at least two site visits by the Appraisers and Umpire along with site visits by agents of the Appraisers and Umpire[.]"  (Award at 1.)  The Award concluded that the "actual cash value" of the "property loss" to the Building was $5,328,016 (itemized in an attached Excel spreadsheet,

see Docket Entry No. 35-3)[2]; that the "extra expenses incurred" were $200,850; and that Plaintiffs' "loss of rents and other related expenses" should be valued "as incurred . . . during the repairs process."  (Award at 1.)  The Award explained that these sums reflected "the agreed physical damages and projected repair costs" at the Building.  (Id.)  No separate value was given for the "replacement cost" of the loss, or for "depreciation," because, the Award concluded, "[t]he building damage is a repair to a small part of the building and therefore not subject to depreciation as there was no betterment to the building."  (Id. at 1-2.)

On January 4, 2017, after Plaintiffs had demanded an appraisal but before the panel commenced its work, Plaintiffs filed this action in the Supreme Court of the State of New York, County of New York, asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, failure to timely and properly adjust an insurance claim, declaratory judgment of liability, statutory damages under section 349 of the New York General Business Law, and appraisal and liability on any appraisal award.  (Compl. ¶¶ 96-125.)  On February 10, 2017, Defendant removed this action to this Court.  (Docket Entry No. 1.)

From May 22, 2017 to August 15, 2018, this action was stayed pending the parties' completion of the appraisal process.  (Docket Entry Nos. 14, 24.)  On November 15, 2018, the Hon. Deborah A. Batts, United States District Judge, directed the parties to file their cross-motions (Docket Entry No. 30), which they subsequently did.

## DISCUSSION

Plaintiffs seek an order confirming the Award pursuant to N.Y. C.P.L.R. §§ 7510 and 7601.  (See Memorandum of Law in Support of Plaintiffs' Motion to Confirm Appraisal

---

[2]     This figure was almost $2 million lower than Plaintiffs' property loss claim, which totaled $7,239,485 and was also set forth in the spreadsheet.  (Docket Entry No. 35-3.)

Award ("Plaintiffs' Memo," Docket Entry No. 39) at 1-2.)  Asserting that "judicial review of appraisals is highly deferential, and the grounds for attacking awards are accordingly very narrow," plaintiffs contend that the Award should be confirmed because "there is no assertion of fraud, bias, or bad faith by the Panel," which "stayed within the scope of its responsibilities." (Id. at 3.)

Defendant Federal seeks to vacate the Award on four principal grounds.  First, Defendant claims that the appraisal was not conducted in accordance with N.Y. Ins. L. § 3408(c). (See Memorandum of Law in Support of Federal's Motion to Vacate or Modify ("Defendant's Memo," Docket Entry No. 34) at 11-14.)  Second, it argues that the appraisal was not conducted in accordance with the Policy.  (Id. at 14-17.)  Third, it asserts that the Award is "wholly irrational," in that it is based on Plaintiffs' proposed "Inside-Out" repair methodology, which Defendant posits is "physically impossible."  (Id. at 17-18.)  Fourth, it contends that the appraisal process was "riddled with misconduct" and violated Defendant's "fundamental procedural rights."  (Id. at 6-11.)  Defendant further argues that, even if the Court does not vacate the Award, it should modify the Award in numerous respects "to correct mistakes and remove costs clearly not covered under the Policy."  (Id. at 19-24.)

Legal Standards

Under New York law, an appraisal "may only decide a limited set of factual disputes," Zarour v. Pac. Indem. Co., No. 15-CV-2663 (JSR), 2017 WL 946332, at *1 (S.D.N.Y. Feb. 22, 2017), including "the actual cash value, the replacement cost, the extent of the loss or damage and the amount of the loss or damage which shall be determined as specified in the policy[.]"  N.Y. Ins. L. § 3408(c) (McKinney).  See also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005) ("an appraisal . . . is limited to factual disputes

over the amount of loss for which an insurer is liable[ ]").  "[T]o the extent that an appraisal

decides issues beyond one of these statutorily-prescribed areas, that determination is not entitled

to deference by the court."  Zarour, 2017 WL 946332, at *2.

       The appraisal must also "substantially" comply "with the terms of the

submission."  Glicksman v. N. River Ins. Co., 86 A.D.2d 760, 760, 448 N.Y.S.2d 77, 78 (4th

Dep't 1982) (quoting Gansevoort Holding Corp. v. Palatine Ins. Co., 11 Misc. 2d 518, 522, 170

N.Y.S.2d 171, 174 (Sup. Ct. N.Y. Co. 1957), aff'd, 7 A.D.2d 720, 181 N.Y.S.2d 172 (1st Dep't

1958)); Allstate Ins. Co. v. Kleveno, 81 A.D.2d 648, 649, 438 N.Y.S.2d 384, 386 (2d Dep't

1981) (setting aside appraisal award in part because "[t]he umpire clearly went beyond the scope

of the parties' agreement").

       If an appraisal exceeds its statutorily-prescribed authority or violates the terms of

the submission, the resulting award may be vacated.  Zarour, 2017 WL 946332, at *2.  However,

if it remains within the limits prescribed by statute, and if the panel substantially complies with

the terms of the submission, the Court may modify or vacate the award only on a showing of

"fraud, bias or bad faith."  Id. (quoting Forbes v. Cendant Corp., 205 F.3d 1322 (2d Cir. 2000)).

See also Silverstein v. Xl Specialty Ins. Co., No. 15-CV-6818 (VEC), 2016 WL 3963129, at *5

(S.D.N.Y. July 21, 2016) ("An appraisal award should be upheld unless there is clear and

convincing evidence that the appraiser rendered the award in bad faith without sufficient

thoroughness or based on bias or fraud."); 101 W. 23 Owner I LLC v. 715-723 Sixth Ave.

Owners Corp., 174 A.D.3d 447, 448, 102 N.Y.S.3d 426, 427 (1st Dep't 2019) (finding "no basis

to disturb the neutral's appraisal" where the "appraisal followed the procedures as set forth in the

lease" and there was no evidence of "fraud, bias or bad faith"); Johnson Kirchner Holdings, LLC

v. Galvano, 150 A.D.3d 1001, 1002, 54 N.Y.S.3d 647, 649 (2d Dep't 2017) ("An appraisal will

not be set aside absent proof of fraud, bias, or bad faith[.]").

Where an appraisal stays within its statutory and contractual limits, it is "entitled

to every reasonable intendment and presumption of validity."  Glicksman, 86 A.D.2d at 760, 448

N.Y.S.2d at 78 (citation omitted); see also Hemingway v. State Farm Fire & Cas. Co., 187

A.D.2d 814, 815, 589 N.Y.S.2d 956, 957 (3d Dep't 1992) ("plaintiffs' proof failed to raise

triable issues of fact sufficient to overcome the presumption of validity which attached to the

appraisal process").  In such cases, "appraisal awards receive deferential judicial review that is

similar—but not identical—to the standard of judicial review for arbitration awards."

Silverstein, 2016 WL 3963129, at *5.  See also Sinclair Wyoming Ref. Co. v. Infrassure, Ltd,

No. 19-8018, 2020 WL 4743849, at *6 (10th Cir. Aug. 17, 2020) ("Absent a showing of fraud,

bias, bad faith, misconduct, or a failure on behalf of the appraisers to abide by the governing

contract, courts [applying New York law] will not set aside an appraisal award.").


Defendant's Arguments for Vacatur or Modification

*Compliance with New York Law*

Defendant argues that the Award should be vacated because it fails to comply

with New York Insurance Law section 3408(c), which provides, in relevant part:

> An appraisal shall determine the actual cash value, the replacement cost,
> the extent of the loss or damage and the amount of the loss or damage
> which shall be determined as specified in the policy and shall proceed
> pursuant to the terms of the applicable appraisal clause of the insurance
> policy and not as an arbitration.  Notwithstanding the provisions of this
> subsection, an appraisal shall not determine whether the policy actually
> provides coverage for any portion of the claimed loss or damage.

N.Y. Ins. L. § 3408(c) (McKinney).  Defendant contends that the Award violates section 3408(c)

because it fails to separately determine the "actual cash value" and the "replacement cost" of the

loss.  (Defendant's Memo at 1, 11-13.)[3]  Moreover, according to Federal, although the figure given in the Award appears under the heading "actual cash value," the Award "effectively sets forth only RCV [replacement cost]," because it does not adjust the awarded amount to reflect that "the repairs would better the Building," and thus fails to "identify ACV [actual cash value]," leaving Federal "unable to determine its obligations under the Policy."  (Id. at 12.)

        Section 3408(c) serves to *limit* the issues that may be determined in an appraisal. See, e.g., Zarour, 2017 WL 946332, at *2 (an appraisal award must be vacated if it "decides issues *beyond* one of these statutorily-prescribed areas") (emphasis added).  Defendant does not cite, and the Court's research has not disclosed, any case vacating an appraisal award due to a panel's failure to enumerate a separate value for each calculation listed in the statute: the "actual cash value, the replacement cost, the extent of the loss or damage and the amount of the loss or damage."  See N.Y. Ins. L. § 3408(c) (McKinney).  Nor does the legislative history of section 3408(c) support vacatur on that ground.  Before 2014, section 3408(c) provided in relevant part that "[i]f an appraisal is so ordered, it shall be limited to a determination of the actual cash value and/or replacement cost, *or* the amount of loss which shall be determined as specified in the policy . . ."  N.Y. Ins. L. § 3408(c) (McKinney 2010) (emphasis added).  In 2014,

---

3       Federal contends that the omission is material because the Policy provides that, in the
        event of covered loss or damage, Federal will, at its option, either: "(1) Pay the value of
        lost or damaged property; (2) Pay the cost of repairing or replacing the lost or damaged
        property . . . ; (3) Take all or any part of the property at an agreed or appraised value; or
        (4) Repair, rebuild or replace the property with other property of like kind and quality . .
        ."  (Policy at ECF page 68 (Building and Personal Property Coverage Form, § E(4)(a)).)
        The Policy also provides, however, that the insured "may make a claim for loss or
        damage covered by this insurance on an actual cash value basis instead of on a
        replacement cost basis," and that Federal "will not pay on a replacement cost basis for
        any loss or damage: (1) [u]ntil the lost or damaged property is actually repaired or
        replaced; and (2) [u]nless the repairs or replacement are made as soon as reasonably
        possible after the loss or damage."  (Policy at ECF page 72 (Building and Personal
        Property Coverage Form, §§ G(3)(c), (d)).).

the Legislature modified the language of section 3408(c) to clarify that courts should take a

broader view as to what issues are subject to appraisal.  As explained by the Assembly:

> JUSTIFICATION:  One manner of resolving disputes under certain
> insurance policies is the appraisal process, which is similar to arbitration.
> When an insured requests an appraisal, and the insurer refuses, the insured
> can seek a Court Order requiring the insured to participate in the appraisal
> process.  Unfortunately, the Courts have taken a limited view as to what
> issues are subject to appraisal.  This bill would clarify that the amount of
> the loss is a proper subject of arbitration.  This change will result in
> substantial savings in litigation costs to both sides of a dispute.

New York State Assembly Memorandum in Support of Legislation, Bill No. A09346A (2014),

available at https://assembly.state.ny.us/leg/ (last accessed September 3, 2020).[4]  The statutory

language does not impose a duty on every appraisal panel, in every case, to separately state "the

actual cash value, the replacement cost, the extent of the loss or damage and the amount of the

loss or damage."

Even if section 3408(c) could properly be read to impose such a requirement, the

Award, which explains that the panel determined that only one method of repair was feasible and

that the damage and repair to the small part of the building were coextensive, such that repair

would not result in "betterment," substantially complied with the statute.  The Policy does not

define either "replacement cost" or "actual cash value."  Under New York law, "[t]he

determination of actual cash value is made under a broad rule of evidence which allows the trier

of fact to consider 'every fact and circumstance which would logically tend to the formation of a

correct estimate of the loss.'"  Cass v. Finger Lakes Co-op. Ins. Co., 107 A.D.2d 904, 905, 483

---

[4]     Although the Property was damaged in 2012, before the 2014 amendment to section
3408(c), both parties rely on the current version of the statute (see Defendant's Memo at
11-12; Reply Memorandum in Support of Plaintiffs' Motion to Confirm ("Plaintiffs'
Reply Memo," Docket Entry No. 44), at 8-9), which was in effect during the appraisal
process.

N.Y.S.2d 849, 850 (3d Dep't 1985) (quoting McAnarney v. Newark Fire Ins. Co., 247 N.Y. 176, 184, 159 N.E. 902, 905 (1928)).  In some cases, to be sure, the parties readily agree (or the contract plainly provides) that "actual cash value" may be calculated as "replacement cost minus depreciation."  See, e.g., Mazzocki v. State Farm Fire & Cas. Corp., 1 A.D.3d 9, 12-13, 766 N.Y.S.2d 719, 722 (3d Dep't 2003); First Roumanian Am. Congregation v. GuideOne Mut. Ins. Co., 862 F. Supp. 2d 293, 297 (S.D.N.Y. 2012) ("Actual Cash Value is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration or depreciation however caused[.]").  In this case, however, the panel made a factual finding that, because "after the repair Plaintiff would not be any better off than it had been, the building would have, no new features, nor any capital improvements" (and thus "that there was no betterment" to the Building, and nothing to deduct), "the Actual Cash Value of the loss was equivalent to the Replacement Cost Value of the loss."  (Murray Dec. ¶ 79.)  Defendant has not cited, and the Court has not located, any case disturbing an appraisal panel's factual finding of no depreciation as a violation of section 3408(c).  The failure of the Award to list the same figure twice, in two different columns, was consistent with the panel's factual findings and is not, in itself, grounds for vacatur.

Defendant argues that the panel's conclusion was both factually incorrect, because "[m]ultiple items in the Award would better the property," including a "new HVAC system, repainting the Wall through the sixteenth floor, and a superior copper wall system" (Martin Dec. ¶¶ 79-81), and legally incorrect, because the panel failed to consider "every factor available" to determine ACV "using the broad evidence rule."  (Defendant's Memo at 11 (citing Gervant v. New England Fire Ins. Co., 306 N.Y. 393, 398, 118 N.E.2d 574, 576 (1954)).)  However, factual determinations as to value by an appraisal panel—including determinations as

to "betterment"—are entitled, like arbitration awards, to "deferential judicial review."

Silverstein, 2016 WL 3963129, at *5.  Applying that deferential standard of review, the record

contains sufficient factual support for the panel's determination that the repairs would not better

the Building.[5]  Moreover, neither the brevity of the Award itself nor the evidence presented by

the parties suggests that umpire Young refused to "consider" all relevant evidence on the subject

of actual cash value, as required under Gervant.  See Olympia & York 2 Broadway Co. v.

Produce Exch. Realty Tr., 93 A.D.2d 465, 472, 462 N.Y.S.2d 456, 460 (1st Dep't 1983) ("The

determination in Gervant was reached solely because the appraiser disregarded the various

factors which the contract between the parties required to be taken into account in determining

value. . . . In our case . . . [t]here was no refusal on the part of the appraisers to permit the parties

to offer their views and opinions on the issue.").  Instead, umpire Young appears to have

thoughtfully considered and carefully weighed each of the issues raised by Martin, in some

instances "discount[ing] some of the numbers presented by the owner . . . to take into account

some of the points that [he had] raised."  (Martin Dec. Ex. 4, at 3.)  Given the umpire's

consideration of all of the factors presented to him, the Court concludes that the panel's

determinations—that in this case actual cash value and replacement cost were "equivalent"—

substantially complied with section 3408(c) and did not constitute legal error.

---

[5]     For example, the panel considered evidence that the expense for a "new HVAC system" was in fact an expense related to removal, relocation, and replacement of air conditioning systems from and above the roof of the lobby (to accommodate the installation of the temporary staircase needed to complete the repairs), to pay for a "large crane for roof top units manipulation," and to "supply and install all necessary ductwork for positive pressure and heat inside [the] new temporary staircase" (Murray Dec. ¶ 83; Wilson Dec. ¶¶ 16-17)—not for a "new HVAC system" which might better the Building.  Similarly, the panel considered evidence that the "superior copper wall system" was used instead of an aluminum system "[d]ue to the heat that would be required to weld the aluminum, and the dangers involved with the transmission of the heat through other parts of the building," rather than to better the north wall.  (Murray Dec. ¶ 88.)

Nor are the panel's "failure to specify the extent of damage" and "failure to explain adjustments" indicative of fatal non-compliance with section 3408 or legal error. (Defendant's Memo at 13-14.)  There is no requirement that an appraisal panel write a reasoned opinion.[6]  The Award's attachments detail the sum arrived at by line item.  (Rudoshko Dec. Ex. 3.)  Moreover, umpire Young explained his analysis to Martin in an email days before the Award (Martin Dec. Exs. 4, 6), noting that he had already discounted portions of Plaintiffs' claim because of "some of the points that you have raised regarding calculations regarding the area of demolition and volume of concrete."  (Id.)  Young's failure to supply a precise mathematical calculation for each discount did not render them improper.  See Olympia & York 2 Broadway Co., 93 A.D.2d at 472, 462 N.Y.S.2d at 460 ("There is no merit to plaintiff's claim that the determination was improperly arrived at by compromise.  Appraisers must act fairly and reasonably [ ].  They are not required dogmatically to stick to their initial calculations, otherwise deadlock would be almost inevitable.").[7]

---

[6]     Defendant cites John P. Burke Apartments, Inc. v. Swan, 137 A.D.2d 321, 528 N.Y.S.2d 718 (3d Dep't 1988) for the proposition that the Award's "failure to explain adjustments" "requires vacatur of the appraisal award."  Swan did not involve confirmation of an appraisal award issued pursuant to N.Y. Ins. L. § 3408(c).  Instead, it involved a disputed property tax assessment where the parties submitted their experts' dueling appraisals directly to the Supreme Court in Warren County, New York for a determination of the appropriate assessment.  The Court rejected one of those expert's appraisal (and testimony) because it made its "conclusions without supporting calculations, rendering it impossible . . . to analyze."  Id., 137 A.D.2d at 325, 528 N.Y.S.2d at 720.  See also Pritchard v. Ontario Cty. Indus. Dev. Agency, 248 A.D.2d 974, 974, 669 N.Y.S.2d 1004, 1005 (4th Dep't 1998) (citing Burke and affirming lower court's striking of an owner's appraisal report, submitted in a condemnation proceeding, where the appraisal "failed adequately to set forth the facts, figures and calculations supporting the appraiser's conclusions").  Burke does not address the standard for confirmation or vacatur of an appraisal award under section 3408(c).

[7]     The Court notes, in this regard, that Federal's appraiser Martin expressly offered to "split[] the difference" between two competing demolition bids.  (Martin Dec. Ex. 2, at 2.)

*Compliance with the Policy*

Defendant next contends that the Award failed to comply with the Policy in five respects: by "(1) including costs not covered under the Policy; (2) using a broader valuation standard to determine the amount of loss; (3) considering claims never submitted during the adjustment; (4) failing to value the property [as a whole]; and (5) failing to value the Exterior Method."  (Defendant's Memo at 14-18.)

Defendant's first two challenges—that the panel "exceeded its authority under the Policy" by valuing and awarding "uncovered costs," and made "a coverage determination" when it "awarded costs to minimize inconvenience associated with repairs"—are, in essence, coverage disputes as to specific components of the Award, and thus may be grounds for modification but not for vacatur.  See, e.g., D.R. Watson Holdings, LLC v. Caliber One Indem. Co., 15 A.D.3d 969, 969, 789 N.Y.S.2d 787, 787 (4th Dep't 2005) (modifying portion of appraisal award that was beyond the scope of the parties' Policy).  The Court therefore addresses these coverage arguments below, in its discussion of Defendant's alternative motion to modify.

Defendant's third challenge is its assertion that Plaintiffs submitted a "new claim of water damage" on April 16, 2018, at the conclusion of the appraisal process.  (Defendant's Memo at 7-8, 16.)  In fact, the record shows that Plaintiffs did not present a "new claim" for water damage; water damage was already an issue with respect to the scope of required repairs. Plaintiffs' estimator, Ken Wilson, alerted the panel that day that, "[d]ue to heavy rains yesterday and this morning the building . . . took on water in several areas of the building," and reported that the Building would need mold remediation on "materials that have been wet *over an extended period of time*."  (Supplemental Declaration of Wayne M. Martin ("Martin Supp. Dec.," Docket Entry No. 50) Ex. 14 (emphasis added).)  While Wilson's email enumerated certain costs

being incurred "due to the continuation of water intrusion into the building," Wilson expressly left it to umpire Young to determine whether and how to incorporate those costs into the Award: "In conclusion Michael, I'm not sure how I should handle these additional costs which continue to grow with each day that a final resolution has not been reached[.]"  (Id. at 2.)  Umpire Young, in turn, relied on the continuing water intrusion as *evidence* of the need to include the first floor of the Building in the *scope* of the Award: "Given the recent water penetration in the building, I am less willing that I previously might have been to consider removing the first floor from the scope[.]"  (Martin Dec. ¶¶ 56-60 & Ex. 6; Martin Supp. Dec. ¶¶ 25-28; see also Wilson Dec. ¶ 15 ("[M]y estimate does not include values or scopes concerning any losses or incidents after December 2012.  Specifically it does not include the water intrusion which occurred while the appraisal process was ongoing.").)  Notably, appraiser Martin did not object to Young's statement at the time, responding that Defendant would "agree to demolish the first floor." (Martin Dec. Ex. 4.)

Defendant's fourth argument is that the Award should be vacated because it failed to "state separately the value of the property and the amount of loss."   (Defendant's Memo at 16; Policy at ECF page 67 (Building and Personal Property Coverage Form, § E(2)).)  Defendant relies on Mizrahi v. Nat'l Ben Franklin Fire Ins. Co., 37 N.Y.S.2d 698, 703 (City Ct. Kings Co. 1942), where the court found an appraisal award invalid because it failed to separately state the "sound value" and "loss or damage to each item" appraised, as required by the applicable policy. The parties have not identified, and the Court's research has not disclosed, any New York decision that has followed Mizrahi on this point, and other courts, outside this jurisdiction, have declined to apply similar policy language so rigidly as to undermine an otherwise valid award. See Glendale LLC v. Amco Ins. Co., No. 3:11-CV-3 (RJC) (DCK), 2012 WL 1394746, at *7

(W.D.N.C. Apr. 23, 2012) (rejecting an argument that an appraisal award should be vacated because the "award does not comply with the Policy" in that "it does not 'state separately the value of property and the amount of loss'"); Beltramo Enterprises II, Inc. v. United Fire & Cas. Ins. Co., No. 2:04-CV-65 (AGF), 2006 WL 744304, at *5 (E.D. Mo. Mar. 23, 2006) ("Nor can Defendant escape the binding effect of the process which it endorsed by asserting that appraiser Wilt failed to state separately the value of the property," when Defendant's own appraiser "also provided nothing more than the loss calculation[.]").

Moreover, as Federal acknowledges in its reply brief, "[t]he Policy contemplates appraisal to value only those claims about which the parties previously disagreed" (Defendant's Reply Memorandum of Law ("Defendant's Reply Memo," Docket Entry No. 48) at 3), and there is no evidence in the record that the parties ever disagreed, or sought appraisal, as to the value of the Building as a whole. (See May 6 Letter at 1 (arguing that the appraisal should include "consideration of all potential repair methods," but saying nothing about the "value of the property" itself).) That is presumably because, as the Award explained, the damage "is a repair to a small part of the building" (Award at 2), and the value of the entire Building does not bear on either the actual cash value or the replacement value of that loss. On these facts, application of Mizrahi to invalidate the Award would be particularly inappropriate. The Court therefore concludes that the panel's appraisal of the actual cash value (and replacement value) of the loss, even without a valuation of the entire Building, substantially complied with the Policy.

Defendant's final argument that the appraisal failed to comply with the Policy rests on its assertion that the panel failed to value appraiser Martin's favored Exterior Method. Though no provision of the Policy set forth a requirement that the panel separately value each side's proposed repair methodology, Defendant argues that it established such a requirement on

May 6, 2016, when it wrote: "Our agreement to the appraisal process is premised upon and requires that the appraisal include consideration of all potential repair methods."  (May 6 Letter, at 2.)  According to Federal, the May 6 Letter became part of the "terms of the submission," with which New York law provides that an appraisal panel must comply.  (Defendant's Memo at 14-17; Defendant's Reply Memo at 2-3; Rudoshko Dec. ¶ 19.)  Plaintiffs counter that Defendant could not unilaterally amend the Policy by letter and that they never agreed "that the award [should] specify the damages suffered under two separate methods (inside-out and outside-in)." (Memorandum of Law in Opposition to Federal's Motion to Vacate the Appraisal Award ("Plaintiffs' Opposition Memo," Docket Entry No. 41) at 13.)

New York law does not define what comprises the "terms of the submission."  In Gansevoort Holding Corp., the court used the term where the parties had agreed not only to an insurance policy, but also to a separate "appraisal agreement," executed by both parties, to govern the appraisal of a fire loss.  11 Misc. 2d at 520, 170 N.Y.S.2d at 173.  The Glicksman court cited Gansevoort Holdings Corp. for the rule that the appraisers and umpire must "substantially compl[y] with the terms of the submission," and applied that rule to vacate an award which failed in multiple significant respects to comply with the parties' insurance contract.  86 A.D.2d at 760-61, 448 N.Y.S.2d at 77-79 ("It is undisputed that the parties did not follow the appraisal process contained in the insurance contract.  There was no written demand for an appraisal, no attempt to have appraisers select an umpire, and no effort to have the appraisers agree.  The record is unclear as to whether plaintiff ever hired an appraiser . . .").  Neither case stands for the proposition that one party's pre-appraisal correspondence may dictate the terms on which an appraisal must proceed.

Even assuming *arguendo* that Federal's May 6 Letter became a part of the "terms of the submission," however, the record shows that the panel substantially complied with those terms.  The May 6 Letter demanded, in varied language, that the appraisal "consider[ ]," "separately address[ ]," "appropriate[ly] valu[e]," "evaluat[e]," and "include[ ]" all possible repair methodologies.  (May 6 Letter at 1-4.)  It also asserted that taking into account "all of the potential repair methods" would be "advisable."  (Id. at 3 ("[W]e suggest it would be advisable for the appraisers, their consultants, and any umpire to review the above issues and to hopefully agree upon taking into account all of the potential repair methods.").)  At the same time, Federal recognized that a "pending DOB audit procedure" would "likely determine whether or not" Federal's preferred "exterior repair option is available."  (Id. at 2.)  Ultimately, after considering and evaluating the proposed Exterior Method, the panel determined that Plaintiffs' approach was the "only approach which is both feasible (given lack of access) and ensures watertightness." (Martin Dec. Ex. 6; see also Murray Dec. ¶¶ 40-42.).)  Thus, while the panel declined to assign a monetary value to the Exterior Method, it came to that decision only after "considering" and "evaluating" both proposed repair methods.  "Appraisers have broad discretion as to their methods and as to their sources of information[.]"  Perlbinder v. Jakubovitz, 239 A.D.2d 294, 294, 658 N.Y.S.2d 267, 268 (1st Dep't 1997).  In this case, the panel's consideration and rejection of Defendant's proposed repair methodology substantially complied with the "terms of the submission," even if the relevant terms are deemed to include those set forth in Defendant's May 6 Letter.

*Alleged Irrationality*[8]

Defendant next contends that the Award should be vacated as "wholly irrational" because Plaintiffs' proposed Inside-Out method is "physically impossible" and "would not be approved by the DOB."  (Defendant's Memo at 17-18; Defendant's Reply Memo at 6, 7.)  Defendant made the same arguments to umpire Young (see Martin Dec. Ex. 6; Hogan Dec. ¶ 56 & Ex. 8), who rejected them after a nearly year-long appraisal process involving multiple site visits and expert opinions from a myriad of consultants and engineers.  One of those experts was a neutral engineer (Feuerborn), retained by Young with the consent of both parties, who agreed that the Inside-Out approach "is the only approach which is both feasible (given lack of access) and ensures watertightness."  (Martin Dec. Ex. 4, at 2-3.)

Federal's "impossibility" arguments to the panel, now reprised virtually unchanged to this Court, are "factual questions that [could] be resolved by a duly appointed appraisal panel, aided by the opinions of experts."  Amerex Grp., Inc. v. Lexington Ins. Co., 678 F.3d 193, 206 (2d Cir. 2012).  It is "not this Court's function to reweigh evidence or expert opinions."  Sinclair Wyoming Ref. Co. v. Infrassure Ltd, No. 15-CV-194 (NDF), 2019 WL 1966667, at *5 (D. Wyo. Feb. 1, 2019) (applying New York law in reviewing an award following an appraisal conducted pursuant to N.Y. Ins. L. § 3408(c)); see also Quick Response Commercial Div. v. Cincinnati Ins. Co., No. 1:14-CV-779 (GLS) (DEP), 2015 WL 5306093, at *3 (N.D.N.Y. Sept. 10, 2015) ("[T]he parties dispute the extent of work required to repair the

_____

[8]    Defendant cites no case law vacating (or modifying) an appraisal award based on that award's irrationality, but at least one court in New York has suggested that irrationality could serve as a basis for vacatur.  See 936 Second Ave., L.P. v. Second Corp. Dev., Co., 82 A.D.3d 446, 446, 917 N.Y.S.2d 865, 865-66 (1st Dep't 2011) ("The appraisal was made pursuant to the procedure set forth in the parties' lease. . . .  [T]here was no evidence of fraud, bias or bad faith in the appraisal process.  Nor was the award irrational.  Absent such evidence, 'the appraisal should stand[.]'") (citation omitted).

damage caused by the fire and the necessary methods of such repair.  These disputes, related to the extent and amount of the damage to the insured property, are factual questions that fall squarely within the scope of the policy's appraisal clause.").  It would vitiate the purpose of an appraisal for this Court, lacking construction expertise, having never visited the Building, and unaided by any neutral expert testimony, to conclude that umpire Young's findings of fact concerning the feasibility of the Inside-Out repair methodology must be rejected as irrational.[9]

*Alleged Misconduct*

Defendant urges this Court to vacate the Award because what Defendant characterizes as "Coral's misconduct" during the appraisal process "biased the Award and prejudiced Federal's rights."  (Defendant's Memo at 6-11; Defendant's Reply Memo at 10.) Defendant claims (1) that "an impassioned, ex parte plea by Coral executive David Podolsky" to consider the "convenience of the students" "increased the scope of the Award"; (2) that the alleged "new claim of water damage" also "increased the scope of the Award"; and (3) that "Coral and the umpire encouraged Federal's appraiser to 'settle' directly with Mr. Podolsky

---

[9]     On reply, Defendant submitted the "application details" of a DOB "pre-filing" made by Plaintiffs on or about December 27, 2018—after the cross-motions were filed—reflecting an application to perform "concrete repair work along exposure 2 façade between 129 Third Avenue and 133 Third Avenue," at an "estimated total cost" of $1,385,000. (Supplemental Declaration of Daniel Joseph Hogan ("Supp. Hogan Dec.," Docket Entry No. 51) Ex. 16.)  Defendant argues that this pre-filing "is entirely inconsistent with the Appraisal Award," and "indicates that Coral is not going to repair the Building using the Inside-Out Method upon which the Award is based."  (Defendant's Reply Memo at 6-7.) It is not clear to the Court whether Plaintiffs' DOB pre-filing represents the entire scope of work Plaintiffs intend to perform to address the loss at issue in the Award.  In any event, the Court cannot base a determination that the Award was "irrational," or that the Inside-Out method is impossible, on Plaintiffs' post-Award pre-filing.  Moreover, because coverage issues remain outstanding and the Court therefore will not enter a separate judgment on its decision concerning the Award, the parties may address the relevance, if any, of Plaintiffs' pre-filing in connection with further proceedings.

rather than complete the appraisal," leading, in part, to umpire Young feeling "pressure" to end

the appraisal.  (Defendant's Memo at 7-9.)  Defendant further claims that the panel "repeatedly"

denied Defendant's appraiser Martin the "opportunity to be heard," including (4) when it denied

him access to "crucial documents" depicting "how the Inside-Out Method could be performed";

(5) "failed to consider evidence of scaffolding costs provided by Federal's appraiser"; and (6)

"disregarded Federal's appraiser when he noted additional factors that must be considered when

determining" actual cash value.  (Id. at 9-11.)

      As explained above, where an appraisal has substantially complied with New

York law and the terms of the parties' Policy, a party seeking to vacate the award has the high

burden of establishing that the award was the product of fraud, bias, or bad faith:

> An appraisal proceeding, such as this, which indicates a sustained effort at
> considerable expense to determine scientifically the extent of damage, is
> entitled to every reasonable intendment and presumption of validity,
> provided the appraisers and umpire have substantially complied with the
> terms of the submission.  Their award should not be denied effect in the
> absence of clear and strong proof amounting to fraud, bad faith or
> misconduct.  An award is not to be invalidated merely because the
> respective appraisers zealously maintain a position favorable to the rights
> of the parties who nominated them.

Gansevoort Holding Corp., 11 Misc. 2d at 522, 170 N.Y.S.2d at 174.  Defendant has not made

the necessary showing in this case.

      First, Plaintiffs' "ex parte plea" is no grounds for vacatur: umpire Young

conducted break-out sessions with both sides (see Podolsky Dec. ¶¶ 9-10; Murray Dec. ¶ 77), a

practice which is not prohibited in the informal context of an appraisal proceeding.  See Penn

Cent. Corp. v. Consol. Rail Corp., 56 N.Y.2d 120, 128, 436 N.E.2d 512, 517 (1982) ("an award

made in an appraisal proceeding, conducted in the informal manner accepted in such

proceedings, should not be subject to challenge for failure to observe the formalities suited only

to arbitrators"); <u>Olympia & York 2 Broadway Co.</u>, 93 A.D.2d at 471, 462 N.Y.S.2d at 459-60

("Appraisers may proceed <u>ex parte</u> as long as each party is afforded an opportunity to present his

views as to the matter in dispute."). Nor is vacatur warranted by the allegation that Plaintiffs

demanded that Federal refrain from communicating with its appraiser (<u>see</u> Rudoshko Dec.

¶ 26)—an allegation Plaintiffs deny (<u>see</u> Plaintiffs' Opposition Memo at 2)—because there is no

evidence that Federal was in fact prevented from engaging in such communications.

Second, as explained above, the Award was not increased due to a "new" claim

for water damage: umpire Young merely noted the ongoing water damage, in his explanation of

the scope of the Building's loss, as an additional reason for including the first floor in that scope.

(Martin Dec. Ex. 6.)

Third, Plaintiffs' desire to settle the parties' dispute, and to complete the appraisal

process expeditiously (after spending more than ten months on it), provides no proper basis for

rejection of the Award. Appraiser Martin reports that Plaintiffs' representative Podolsky "made

pleas" to him "to 'settle,'" and that umpire Young then encouraged Podolsky and Martin "to

discuss settlement." (Martin Dec. ¶¶ 62-63.) Podolsky acknowledges that he "express[ed] the

desire that the appraisal come to an end at some point in time." (Podolsky Dec. ¶ 14.) Federal

offers no authority for the proposition that it is improper—much less that it constitutes fraud,

bias, or bad faith—for an appraiser to encourage settlement or to express a desire to promptly

complete the appraisal, and this Court has found none.

Fourth, Defendant has not proffered evidence establishing that umpire Young

denied appraiser Martin "the opportunity to be heard," or "access to crucial documents," in any

manner indicative of fraud, bias, or bad faith. Martin declares that he requested that Plaintiffs

provide him construction details "depicting exactly how the copper panels would be set in place,

joined to each other, and to the existing EIFS Wall and primary structure that remained," but was never provided such materials.  (Martin Dec. ¶¶ 21-25.)  Murray represents in his declaration that, at the outset of the appraisal process, he prepared a binder of "all relevant documents concerning the claim," including "the detailed estimate of Ken Wilson (Atlantic) which has details and a recap by category of all claim components, copies of surveys evidencing the intrusion of concrete into Plaintiffs premises, the estimate of Defendants, and all claims data relevant to the appraisal from both parties."  (Murray Dec. ¶¶ 5-6.)  Podolsky declares that "at no time did I or anyone in my presence present Michael Young with any documents or information that was not as well provided to Wayne Martin."  (Podolsky Dec. ¶ 14; see also Martin Supp. Dec. Ex. 12 (July 5, 2017 email in which Murray confirmed to Martin that he had received only the same drawing Martin received).)

Defendant identifies only one specific, existing document to which it was "denied access": a one-page "Wall Detail I" prepared by C3D Architecture PLLC and attached as Exhibit 4 to Plaintiffs' opposition brief (the "C3D Schematic," Docket Entry No. 41-9), which Martin claims, on reply, that he did not receive during the appraisal process.  (Martin Supp. Dec. ¶ 19.) Plaintiffs proffered in their opposition papers that plans from C3D Architecture were included with the estimate of Ken Wilson.  (Wilson Dec. ¶ 2; Podolsky Dec. ¶ 17; Murray Dec. ¶¶ 21, 46.) Even assuming Martin never received the C3D Schematic, however, the failure to provide Martin that one document—where the record otherwise reflects that Plaintiffs made prompt efforts to provide Martin a binder of "all relevant documents concerning the claim," including the Wilson estimate (Murray Dec. ¶¶ 5-6)—would not alone establish fraud, bias, or bad faith sufficient to vacate the Award.  See Salzman v. KCD Fin., Inc., No. 11-CV-5865 (DLC), 2011 WL 6778499, at *3 (S.D.N.Y. Dec. 21, 2011) (finding no fraud or bad faith and upholding

arbitration award where the party challenging the award offered "no evidence" that its opponent "acted intentionally to withhold" an allegedly withheld document from the arbitral panel).

Nor is the panel's decision not to adopt Martin's view of the scaffolding costs indicative of fraud, bias, or bad faith justifying vacatur of the Award.  According to Martin, he "advised" umpire Young on April 6, 2018, that he believed that Ken Wilson's estimates (amounting to $512,500) were "so inflated that they must be erroneous," and provided approximations of what he believed the true cost of rental, delivery, removal, set-up, and dismantling costs of the necessary scaffolding would be.  (Martin Dec. ¶¶ 71-75.)  He also requested that, if umpire Young were "persuaded to recommend a value other than described above," Young "kindly share with us the specific facts, data, or reasoning that form the basis of your opinion."  (Id. ¶ 73.)  There is no evidence, however, that Martin provided umpire Young with any formal estimate of scaffolding costs or any evidentiary support for his own approximations.  Nor does the record contain any explanation for why Martin waited until April 6, 2018, near the conclusion of the appraisal process, to advise umpire Young of his challenge to Wilson's estimate, which he had received from Plaintiffs' appraiser no later than June 6, 2017. (Murray Dec. ¶¶ 5-8.)  Moreover, although there is no evidence of a written explanation on this point from umpire Young to Martin, Young ultimately awarded Plaintiff only $300,000 of Ken Wilson's $512,500 estimate in scaffolding costs, a figure agreed to by Murray and umpire Young "after discussions were had concerning what we on the panel believed appropriate."  (Id. ¶ 51.) Martin's continued disagreement with the $300,000 awarded does not furnish grounds to vacate the Award.  See, e.g., Johnson Kirchner Holdings, LLC, 150 A.D.3d at 1003, 54 N.Y.S.3d at 649 ("Here, the purported factual errors and conflicting expert opinion presented by the appellant were insufficient to make the requisite showing for rejection of the challenged appraisal.").

Finally, the record does not support the Defendant's contention that the panel committed "misconduct" by "[f]ail[ing] to consider all of the elements necessary to determine" actual cash value "under the broad evidence rule."  (Defendant's Memo at 11.)  As explained above, the panel substantially complied with New York law in calculating the actual cash value of Plaintiffs' loss and finding "no betterment" to the Building.

*Defendant's Alternative Request for Modification*

In the alternative, Defendant requests that the Court modify the Award "to remove costs not covered by the Policy."  (Defendant's Memo at 18-19.)  As Defendant correctly notes, N.Y. Ins. L. § 3408(c) provides that "an appraisal shall not determine whether the policy actually provides coverage for any portion of the claimed loss or damage."  Moreover, while the more efficient practice for the parties, the appraisers, and the Court is to decide any coverage disputes before an appraisal is conducted, see Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 261 F. Supp. 2d 293, 296 (S.D.N.Y. 2003) (denying motion to compel appraisal as premature, pending the Court's resolution of a coverage dispute between the parties), some courts have modified appraisal awards after the fact to remove or adjust costs not covered under the applicable insurance policy.  D.R. Watson Holdings, LLC, 15 A.D.3d at 970, 789 N.Y.S.2d at 787 (modifying award to award actual cash value, as opposed to replacement cost, of a heating system, where the system had not been repaired or replaced and the policy in question did not permit recovery of replacement cost value until it had been).  Accord Zar Realty Mgmt. Corp. v. Allianz Ins. Co., No. 02-CV-6741 (HB), 2003 WL 1744288, at *5 (S.D.N.Y. Mar. 31, 2003) ("Although defendant, upon further proof, may later decide that these other claims do not come within the scope of plaintiffs' insurance policy coverage, deciding which, if any, of the losses or damages suffered, is subject to reimbursement may be resolved later at trial.").

Defendant asks this Court to modify the Award (1) to remove costs associated with a temporary stairwell the appraisal panel determined is needed in order to complete the contemplated repairs, which Defendant claims is not covered by the Policy; (2) to "remove depreciation and upgrades" from the Award's calculation of actual cash value; (3) to "remove costs not sustained or incurred within the policy-prescribed period"; and (4) to "correct numerous other errors," of which Defendant lists only fourteen "for the sake of brevity." (Defendant's Memo at 19-25.)  Ultimately, Defendant requests that the Court "[m]odify the Award to remove or recalculate" total expenses of $7,824,580.62.  (Id. at 24-25.)[10]

As to the Award's inclusion of expenses for a stairwell (which Defendant refers to as the "Tower"), Defendant argues that it should be modified because:

> First, the Tower is not covered because repairs have not been made within two years of the loss. Second, the Tower is unnecessary for repairs. Finally, even if a staircase were required, the Tower goes far beyond what is required.

(Defendant's Memo at 19.)  To the extent Defendant challenges the appraisers' factual determinations about the necessity of the temporary stairwell to conduct the repairs deemed necessary by the panel—or the cost of that temporary stairwell—the Court will not disturb those determinations in the absence of a showing of fraud, bias, or bad faith.  As discussed above, Defendant has made no such showing.  To the extent Defendant contends that the stairwell is not covered by the Policy because the stairwell is an "increased cost[ ] attributable to enforcement of an ordinance or law regulating the repair of property," and is therefore excluded by the Policy "[u]ntil the property is actually repaired or replaced" and "[u]nless the repairs or replacement are

---

[10]     This figure, which consists of sixteen challenged line-items, some of which appear to overlap or to be based on Plaintiffs' claimed losses, amounts to more than $2 million more than the $5,528,866 actually awarded by the panel.

made as soon as reasonably possible after the loss or damage, not to exceed two years"
(Defendant's Memo at 19; see also Policy at ECF pages 34-39 (Ordinance or Law Combined
Coverage)), Defendant raises a dispute concerning "the scope of coverage provided by an
insurance policy," which it correctly argues cannot be resolved through appraisal.  Zarour, 113 F.
Supp. 3d at 715 (quoting Duane Reade, 411 F.3d at 389).  However, the Award did not resolve
that dispute; it merely determined the necessity, and valued the cost, of the stairwell.  The Court
will therefore deny Defendant's motion to modify the Award on this basis, without prejudice to
Defendant's objection that the Policy does not provide coverage as to this portion of the Award.

Nor has Defendant shown that the Award must be modified to "remove
depreciation and upgrades" from its calculation of actual cash value.  Defendant argues that the
panel erred in concluding that "the building damage is a repair to a small part of the building and
therefore not subject to depreciation as there was no betterment to the building," because the
repairs will in fact better the property.  (Defendant's Memo at 21.)  As discussed above, the
Court will not disturb the panel's factual findings concerning lack of "betterment," which, in any
event, appears to find support in the record.  The Court will not modify the Award on this basis.

Defendant next requests that the Court modify the Award to remove the
"Unincurred Expenses" which the Award provided for Plaintiffs' potential future "loss of rental
income during the period of repair and related reasonable and necessary expenses incurred
during the repairs process."  (Award at 1.)  Defendant argues that the Policy provides coverage
for "business income" and "extra expenses" only when they are sustained and incurred during
the "period of restoration," which ends on the "date when the property at the described premises
should [have been] repaired, rebuilt or replaced with reasonable speed and similar quality."  (See
Defendant's Memo at 22; Policy at ECF pages 74, 82 (Business Income (and Extra Expense)

Coverage Form, §§ A(1), A(2)(b), F(3)(a)(2)).)  According to Defendant, that date has long

passed, so Plaintiffs will not be entitled to reimbursement for business income or extra expenses

incurred in the future.  However, the Award did not explicitly make a finding regarding the

period of restoration,[11] or make a legal determination that Plaintiffs' specific, not-yet-

enumerated "Unincurred Expenses" fall within the scope of the Policy.  The Court will therefore

deny Defendant's motion to modify the Award on this basis, without prejudice to Defendant's

argument that the Policy does not provide coverage as to this portion of the Award.

Lastly, Defendant raises fourteen "other errors" with the Award.  (Defendant's

Memo at 22-24.)  Several of the alleged errors merely repackage Defendant's earlier arguments.

For example, alleged errors one and two repeat Defendant's challenge to the Inside-Out method,

and alleged error three challenges the Award's inclusion of scaffolding costs.  Alleged errors

four, eleven, and fourteen take issue with the amounts of certain awarded costs; these are factual

determinations that the Court will not disturb given the absence in the record of evidence of

fraud, bias, or bad faith.

Of the remaining alleged errors, the Court notes that four raise coverage disputes

under the Policy.  Alleged error five challenges the Award's determination that the amounts

awarded "are NOT subject to deduction for any previous payments or policy deductible[,]"

because "[p]revious payments were for emergency repairs and the deductible as applied to those

emergency repairs."  (Award at 1-2.)[12]  This finding was not a finding of fact regarding the

---

[11]    While "the calculation of the restoration period, unless subject to legal challenges, is a
factual question about damages—albeit sometimes a complex and contentious one—
appropriately addressed by an appraiser," Amerex Grp., Inc., 678 F.3d at 205, the Court
does not read the Award to have answered that question, and Plaintiffs do not argue that
it did.

[12]    Plaintiff does not respond to Defendant's challenge of the Award on this basis.

actual cash value, replacement cost, extent of loss or damage, or the amount of loss or damage,

N.Y. Ins. L. § 3408(c).  Rather, it was a characterization of payments made by Defendant and a

legal interpretation of the Policy, an issue beyond the scope of the panel's task.  The Court will

therefore modify the Award to strike the following determination: "The amounts are NOT

subject to deduction for any previous payments or policy deductible.  Previous payments were

for emergency repairs and the deductible was applied to those emergency repairs."  This

modification will be without prejudice to the parties' respective positions regarding the

application of the Policy's deductible and the effect of Defendant's prior payments.

       Alleged errors six, seven, and eight likewise amount to coverage disputes.  Those

errors concern the panel's award of $200,850 in "Extra Expenses Incurred."  (Award at 1.)  That

figure consists of $14,600 for invoices from A & B Engineering Land Surveying, P.C., incurred

between January 28 and May 22, 2013, for property line surveys, a court appearance, and four

days of unspecified work; $61,250 for invoices dated between February 18, 2013, and January

10, 2018, from SR Harwood Consulting Engineering PC (engineer Harwood's firm)[13]; and

$125,000 (out of $283,872.50 requested) for reimbursement of invoices dated between January

31, 2013, and February 20, 2018, from non-parties C3D Architecture, Iceberg Developing Co.,

LLC, Redeye Technical Services, Inc., and Wexler Associates.  (Rudoshko Dec. Ex. 3, Schedule

5.)  Defendant contends that all of these expenses fall outside the scope of the Policy, which,

according to Defendant, limits the insured's entitlement to "extra expenses" to those incurred "to

minimize the suspension of operations" during the "period of restoration."  (Defendant's Memo

---

[13]    The panel awarded $8,300 less with respect to Harwood's invoices than Plaintiffs
requested, perhaps because the last two invoices (for $3,500 and $4,800) were dated after
the appraisal process began.

at 23; <u>see also</u> Policy at ECF page 74 (<u>Business Income (and Extra Expense) Coverage Form</u>, § A(2)(b)(1)).)[14]  However, Defendant also concedes that it "lacks sufficient information to ascertain whether these expenses are covered under the Policy."  (Defendant's Memo at 23.)  So too does the Court.  The Court will therefore deny Defendant's motion to modify the Award on this basis, without prejudice to Defendant's objection that the Policy does not provide coverage as to this portion of the Award.

Defendant's other alleged errors do not warrant modification of the Award.  Alleged error nine claim challenges the Award's inclusion of "$13,500 for a new Duane Reade sign to be used by during repairs, plus approximately $6,270 for associated markup," as uncovered by the Policy, which provides that the insurer will pay for "direct physical loss of or damage to all outdoor signs . . . in any once occurrence," up to a limit of $5,000.  (Defendant's Memo at 24; Policy at ECF page 46 (<u>Residential Building Enhancements</u>, § C(3)(a)-(b)).)[15]  Plaintiffs counter that the expense is not for loss of or damage to the Duane Reade sign, but to remove, store, and reset that sign in order to complete the necessary repairs to the Building, and that $13,500 is "but a fraction of what the cost to replace it would be."  (Murray Dec. ¶¶ 64-65; Wilson Dec. ¶ 19.)  Defendant does not rebut this characterization on reply.  Moreover, the Award included $13,500 for "Line #" 282 of Ken Wilson's estimate, which aligned with Plaintiffs' understanding: "Detach & Reset Neon . . . Duane Reade sign . . . the removal of the

---

[14]    Appraiser Murray counters that the panel found "that A&B Engineering Land Surveying, P.C.'s fees for attending in court," on an Order to Show cause "to stop the construction from causing further damages," were "properly included for such expenses were incurred to protect the property from further damage" (Murray Dec. ¶¶ 58, 89), and that the remaining expenses were "properly claimed as incurred, directly related to the loss and within the scope of expenses Plaintiff necessarily incurred as a result of the loss."  (<u>Id.</u> ¶ 63.)

[15]    The Court takes judicial notice that a Duane Reade pharmacy is located on the ground level of the Building, at 125-133 3rd Ave, New York, NY 10003.

large wall mounted exterior sign will include the following: 1) scissor lift to remove and reset the sign; 2) capping off of existing electrical feeds leading to the sign; 3) off-site storage for up to 12 months; [and] 4) resetting and re-energizing the sign after the necessary structure repairs have been completed."  (Rudoshko Dec. Ex. 3, at ECF pages 4, 42.)  The Court will therefore deny Defendant's motion to modify the Award on this basis.

Alleged errors ten and twelve concern $24,765 in costs "for off-site storage, plus approximately $11,502 for associated markup," and "$500,000 for undefined 'general conditions,' plus approximately $143,750 for associated tax and overhead and profit." (Defendant's Memo at 24.)  As to the first, Defendant claims that "[i]t is unclear why such storage would be required," and as to the second, "[a]s these costs are not discussed or explained, Federal is uncertain why they were awarded."  (Id.)  In both cases, those costs are detailed in Ken Wilson's estimate (Rudoshko Dec. Ex. 3 at ECF pages 48-50) and are factual determinations within the appraisers' sound discretion, and Defendant has not shown that their inclusion in the Award was the product of fraud, bias, or bad faith.  The Court will therefore deny Defendant's motion to modify the Award on these bases.

Finally, alleged error thirteen concerns $362,098 in costs the Award provided "for tax, calculated at an 8.75% rate."  (Defendant's Memo at 24.)  According to Defendant, appraiser Martin "informed the umpire that New York City will only tax the materials utilized in the repairs," but umpire Young "ignored him, and awarded tax on the full cost of repairs plus general conditions."  (Id.; see also Martin Dec. ¶ 92.)  Plaintiffs' estimator Ken Wilson attests that his estimate included taxes on the cost of repair because, "[w]here there is no capital improvement to the premises, it has been my experience and understanding in the construction industry that such taxes be included."  (Wilson Dec. ¶ 6; accord Murray Dec. ¶ 74.)  Defendant provides no legal

authority for its position,[16] or any basis on which the Court could find that the panel engaged in fraud, bias, or bad faith when it included tax in the Award.  The Court will therefore deny Defendant's motion to modify the Award on this basis.

<u>Plaintiffs' Arguments for Confirmation</u>

In their cross-motion, Plaintiffs ask the Court to confirm the Award as written. Under New York law, a party to an appraisal conducted pursuant to N.Y. Ins. L. § 3408(c) may seek a court order confirming the resulting appraisal Award.  <u>Penn Cent. Corp.</u>, 56 N.Y.2d at 130, 436 N.E.2d at 518; <u>see</u> <u>also</u> <u>Silverstein</u>, 2016 WL 3963129, at *5 ("The New York Court of Appeals has interpreted C.P.L.R. § 7601 to empower a court to hold a special proceeding to confirm an appraiser's award.").[17]

---

[16]     New York's Tax Law provides that sales tax is payable on "receipts from every sale, except for resale," of "[m]aintaining, servicing or repairing real property, property or land . . . as distinguished from adding to or improving such real property, property or land, by a capital improvement[.]"  N.Y. Tax L. § 1105(c)(5) (McKinney).  <u>See</u> <u>also</u> N.Y. Comp. Codes R. & Regs. tit. 20q, § 527.7(b)(4) ("The imposition of tax on services performed on real property depends on the end result of such service.  If the end result of the services is the repair or maintenance of real property, such services are taxable.  If the end result of the same service is a capital improvement to the real property, such services are not taxable.").

[17]     Defendant contends that N.Y. C.P.L.R. § 7601 no longer permits confirmation of an appraisal award stemming from "any agreement contained in the standard fire insurance policy of the state" in light of the following sentence, added in 2010: "Provided, however, that this section shall not apply to any agreement contained in the standard fire insurance policy of the state with the exception of an action to enforce the appraisal clause pursuant to section three thousand four hundred eight of the insurance law which shall not be enforced as an arbitration agreement."  (Defendant's Memorandum of Law in Opposition to Coral's Motion to Confirm Appraisal Award (Docket Entry No. 42) at 3.) The Court disagrees.  By its own terms, section 7601 applies to appraisal clauses, such as this one, which are subject to N.Y. Ins. L. § 3408, and merely provides that it shall not be enforced "as an arbitration agreement."  Here, the Court does not enforce the parties' appraisal clause "as an arbitration agreement."  Rather, it confirms the Award under New York's separate standard for review of appraisal awards.

As explained above, Defendant has not identified any valid basis for vacatur of the Award, and only one item in the Award (the panel's determination that the awarded amount was not "subject to deduction or any previous payment or policy deductible") which must be modified.  Therefore, the Court grants Plaintiffs' cross-motion to confirm the Award in part, subject to the modification set forth in the following paragraph.

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to vacate or modify the Award is granted to the extent that the Award is modified to strike the following determination: "The amounts are NOT subject to deduction for any previous payments or policy deductible.  Previous payments were for emergency repairs and the deductible was applied to those emergency repairs."  This modification is without prejudice to the parties' respective positions regarding the application of the Policy's deductible and the effect of Defendant's prior payments.  Defendant's motion is denied in all other respects.

Plaintiffs' cross-motion to confirm the Award is granted in part, except to the extent of the foregoing modification.

To the extent the Award (as modified) has been confirmed, it establishes the value of the claim elements awarded; it does not resolve any remaining issues as to whether the Policy covers each element awarded.  Moreover, the parties agree that the Court's adjudication of the pending cross-motions to vacate and confirm does not resolve all claims in this action or warrant the entry of judgment.  (Declaration of Charles J. Rocco (Docket Entry No. 43) ¶ 6; Supplemental Declaration of David Karel (Docket Entry No. 45) ¶¶ 4-5.)  Therefore, the parties are directed to meet promptly and confer in a good faith attempt to resolve any outstanding coverage issues.

To the extent legal or factual issues remain in contention following such consultation, the parties are directed to identify them, and any further discovery, motion practice, and/or trial preparation the parties believe will be necessary to resolve this case, in a joint status report directed to the attention of Magistrate Judge Moses, to whom this case remains assigned for general pretrial management.  The joint status report, which must also indicate whether the parties believe that a settlement conference before Judge Moses, a referral to the Court's mediation program, or the parties' participation in a private mediation would be helpful in resolving this case, must be filed by **September 25, 2020**.

This Memorandum Opinion and Order resolves Docket Entry Nos. 33 and 38.

SO ORDERED.

Dated: New York, New York
      September 3, 2020

                                          /s/ Laura Taylor Swain
                                        LAURA TAYLOR SWAIN
                                        United States District Judge